In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2577

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

SAMI NATOUR,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cr-00083-1—**Elaine E. Bucklo**, *Judge*.

ARGUED FEBRUARY 16, 2012—DECIDED NOVEMBER 9, 2012

Before POSNER, RIPPLE and WILLIAMS, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Sami Natour was convicted, following a jury trial, of four counts of interstate transportation of stolen property in violation of 18 U.S.C. § 2314. At sentencing, the district court attributed to him a loss amount of approximately $292,000 and determined that he was "in the business of receiving and selling stolen property," U.S.S.G. § 2B1.1(b)(4); these conclusions resulted in a 14-level increase to Mr. Natour's

base offense level under the Guidelines. *See* U.S.S.G. §§ 2B1.1(b)(1)(G), (b)(4). The district court sentenced Mr. Natour to 28 months' imprisonment on all counts, to run concurrently, followed by three years of supervised release, and ordered restitution in the amount of $104,742.16. Mr. Natour appeals, challenging both his conviction and sentence.

We perceive no violation of the Grand Jury Clause in Mr. Natour's conviction. The terms used in 18 U.S.C. § 2314 are not of a wholly independent character, and the offense conduct proved at trial and stated in the jury instructions are within the charges approved by the grand jury. Further, we find no reversible error in the district court's sentencing decisions. The court properly applied § 2B1.1(b)(4) of the United States Sentencing Guidelines to Mr. Natour as a person in the business of receiving and selling stolen property, and the court used both an acceptable method and evidence-based mathematical figures in arriving at a loss calculation for purposes of § 2B1.1(b)(1). Accordingly, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. Facts

On February 7, 2007, Secret Service Agent Joel Heffernan received a tip from FedEx about suspicious activity on Mr. Natour's account, namely, four packages sent from

"Sam-Tek"[1] to "Sam, SNS" in New York, for cash on delivery in the amount of $63,970. Upon visiting the FedEx facility the following day, agents discovered that the boxes contained 290 new Nextel cellular phones in individual boxes, but not shrink-wrapped. There were no invoices or packing slips. Law enforcement catalogued the contents, and the packages were forwarded on to the delivery address.

The same day, FedEx called the Secret Service again, this time to alert them to two additional packages from Mr. Natour to the same recipient, for cash on delivery in the amount of $20,000. In these two boxes, agents found 100 new Nextel phones packed in the same manner with no packing slips or invoices. Again, the contents were catalogued and forwarded to the recipient.

On February 8 and 9, a person identifying himself as Mr. Natour called FedEx to complain about delayed delivery of his February 7 packages, which he

---

[1] For several years before and during the operative events in the present case, Mr. Natour operated a series of businesses. From 2000 to 2004, Mr. Natour operated Sam-Tek out of his home in Oak Forest, Illinois. He dissolved the company in December 2006, but reincorporated the following month, approximately one month prior to the relevant events in this case, under the name "Sam-Tek US." He also operated, for some unspecified period of time, a cell phone store called "Orbitec," later named "Quickcom," in Chicago Ridge, Illinois, which remained in operation during the relevant events in this case.

claimed contained "electronic equipment such as mother-boards."[2]

On February 12, 2007, agents conducted surveillance of Mr. Natour's home. They observed a man later identified as Andre Williams delivering two cardboard boxes. Later the same day, the agents examined another shipment from the defendant at the FedEx facility. These boxes contained 119 Nextel phones in the same condition as prior shipments, this time addressed to "Frances, SND" in Los Angeles, for cash on delivery of $23,000.

Two days later, on February 14, agents conducted surveillance of Mr. Natour's cell phone business, Quickcom, located in Chicago Ridge. They observed a FedEx driver pick up two packages for shipment. Upon arriving at the FedEx facility, the agents opened the packages and found 55 Nextel phones packed in the same way as prior shipments. The agents searched the trash at Quickcom and recovered five invoices for cell phones ordered by individuals and businesses other than the defendant or any of his business names. The serial numbers on these invoices matched the numbers for phones contained in the February 7 and 8 shipments by Mr. Natour.

On February 27, 2007, agents obtained an arrest warrant for Mr. Natour and search warrants for his home and business. In the search of his home, agents discovered

---

[2] R.191 at 186.

$34,000 in a FedEx box in his crawlspace, as well as various relevant documents including FedEx airbills for the shipments in question. At his business, the agents verified that his inventory was legitimate. The agents also executed a search warrant at SNS in New York, a recipient of several of the suspicious shipments. They discovered an additional 151 new Nextel phones shipped by Mr. Natour to SNS for $30,030 cash on delivery, in the same condition as prior shipments and without packing slips.

Upon his arrest, Mr. Natour cooperated with the agents and provided a statement. In it, he described becoming acquainted with Williams, who Mr. Natour claims obtained cell phones by incorporating a business and purchasing phones in the business's name, only to default on the payment. Williams would sell Mr. Natour the phones for $200 apiece, and Mr. Natour would resell for a profit of $25-$35 per phone. Mr. Natour stated that he had sold approximately 1500 phones to SNS and had dealt with it "for the past five months."[3] He identified other individuals with whom he was involved, and others that were involved with Williams, including one whom he described as "[t]he main business owner dealing with illegal phones."[4] Immediately after these admissions, Mr. Natour's statement concluded: "I think that I made about $60,000 in 2004, $75,000 in 2005 and $90,000 in 2006. I know I didn't claim this

---

[3] R.192 at 91.

[4] R.192 at 91.

money on my taxes. I know what I did, I know what I was doing was illegal, but I wasn't sending any money overseas."[5]

## B. District Court Proceedings

The Government indicted Mr. Natour on five counts of transporting telephones "knowing the same to have been stolen and converted," in violation of 18 U.S.C. § 2314. Each count corresponded to a shipment date: February 7, 8, 12, 14 and 27 of 2007.

At trial, the Government relied heavily on the testimony of Michael Stock, the manager of Sprint's[6] corporate security group. Stock had reviewed all of the inventory data acquired by the Secret Service agents in the course of their investigation. Stock stated that, of the 708 total phones involved in the five shipments, roughly 550 were identified by their serial numbers as Sprint/Nextel phones. Of the Sprint/Nextel phones, 379 were associated with an account "adjustment," which Stock described as follows: When a phone was ordered from Sprint, a line-item charge would be placed on a customer's phone bill. If a customer called Sprint to indicate that a phone purchase never had been autho-

---

[5] R.192 at 91.

[6] Sprint and Nextel merged in 2005. Although not entirely clear from the record, it appears that the business continues to refer to itself as "Sprint," but at least some of its phones are sold under the brand name "Nextel."

rized, nor had any phone actually been ordered or re-
ceived, Sprint would "adjust" the bill to correct the
error. When the charge was unauthorized, the bill
would be adjusted to zero, meaning the entire cost of
the phone would be written-off as a loss by Sprint.
When this process was handled by one of Sprint's fraud
investigators, the loss would be coded in Sprint's
internal accounting system with the notation "F," for
fraud. If the report was handled by a customer service
agent rather than a fraud investigator, it could not be
given the "F" code, although it is possible that the cus-
tomer's complaint could have been identical.

Stock also explained to the jury numerous tables iden-
tifying individual phones and the account adjustments
with which they were associated. He acknowledged
that, although the majority were associated with a
fraud code, other adjustments and other codes also were
present. He noted that, if a customer did not contact
Sprint to complain that a phone was charged improperly
to his account, no fraud investigation would be initiated
and no adjustment made. Stock's testimony suggested
that similar account fraud could go undetected if a cus-
tomer did not notice and report an irregularity on his bill.

Stock tallied all of the adjustments to Sprint accounts
associated with the 379 phones and concluded that,
based on those phones alone, the "minimum loss to
Sprint" was $104,742.16.[7] Stock identified this number as
a "minimum loss" because, although it represented the

---

[7] R.192 at 24; R.186 at 41.

total value of adjustments to customer accounts on the 379 phones for which adjustments were sought, whether coded "F" or otherwise, it did not reflect the full value of the phones, which are offered at a below-cost discount to customers, primarily as inducements to enter or lengthen telephone service contracts.

Stock also testified that neither Mr. Natour nor any of his business names had accounts with Sprint, although one need not be an authorized dealer or account holder to sell Sprint phones. Finally, Stock reviewed the packing slips recovered from the Quickcom trash search and stated that all five were orders by legitimate Sprint customers. All of the packing slips had shipping addresses that did not match the customer's billing addresses, which, he indicated, was evidence of fraud. He also stated that four of the five slips contained orders that were associated with account adjustments. The fifth slip contained an order on the business account of Frito-Lay. Frito-Lay never contacted Sprint to report unauthorized charges or request an adjustment.

More than 150 cell phones catalogued by the agents could not be associated with Sprint. Among them were all 55 cell phones related to Count 4, concerning the February 14 shipment. According to the agents' records, those phones had a differently formatted serial number and could not be identified at all. Accordingly, the Government dismissed Count 4.

At the close of the Government's evidence, Mr. Natour presented no evidence and instead made an oral motion requesting a judgment of acquittal. The court denied

the motion. After the jury returned a verdict of guilty on all counts, Mr. Natour moved for a new trial, which was also denied.

The presentence investigation report ("PSR") recommended a total offense level of 16. Specifically, after accounting for a base offense level of 6, the PSR recommended an 8-point increase under U.S.S.G. § 2B1.1(b)(1)(E) for the amount of loss claimed by Sprint ($104,742) and a 2-point increase under § 2B1.1(b)(4) for being "in the business of receiving and selling stolen property." Mr. Natour objected that the total loss amount should be lower, arguing that there had been insufficient evidence that all 708 phones were stolen. He also claimed that, because he operated a legitimate cell phone business, he was not "in the business of" receiving stolen property. The Government, in turn, argued that Sprint's minimum loss estimates understated the actual loss because it related to only the 379 actually adjusted accounts, rather than the total amount of "stolen" property; in the Government's view, the total value of all 708 phones should be counted.

The district court accepted the Government's view with modifications. The court agreed that an amount that accounted only for the 379 Sprint phones associated with account adjustments was an insufficient reflection of the magnitude of the loss. However, the court adjusted the total amount of phones upon which it would base its estimate from 708 to 653, excluding the 55 phones that had been included in dismissed Count 4. With 653 phones, the court calculated the loss amount at approximately $292,000. Accordingly, the court added

4 levels, for a total of 12, to correspond to its calculated loss amount. *See* U.S.S.G. § 2B1.1(b)(1)(G). Due to the higher loss amount, the court calculated the total offense level at 20, with a guidelines range of 37-46 months' imprisonment. Ultimately, the court entered a below-Guidelines sentence of 28 months' imprisonment. The court also ordered restitution in the amount of loss actually claimed by Sprint, $104,742.16.

## II

## DISCUSSION

Mr. Natour appeals both his conviction and sentence. With respect to his conviction, Mr. Natour submits that the evidence and the jury instructions impermissibly broadened the indictment in violation of his rights under the Grand Jury Clause. *See* U.S. Const. amend. V. Relatedly, he claims that, under his narrower reading of the indictment, the evidence was insufficient to support a conviction. With respect to his sentence, Mr. Natour challenges both the application of the enhancement for being "in the business of receiving and selling stolen property," *see* U.S.S.G. § 2B1.1(b)(4), and the district court's loss calculation. We address each contention in turn.

### A. Constructive Amendment of the Indictment in Violation of the Grand Jury Clause

Mr. Natour contends that his rights under the Grand Jury Clause of the Fifth Amendment were violated

because the Government's evidence at trial and the jury instruction constructively amended the indictment to include additional offense conduct beyond the language of the indictment. Mr. Natour acknowledges that he failed to object to the instruction or to otherwise raise the issue in the district court and that, therefore, review is for plain error. *United States v. Penaloza*, 648 F.3d 539, 546 (7th Cir. 2011). Nevertheless, he argues that the error is plain and per se reversible.

A constructive amendment "occurs where the permissible bases for conviction are broadened beyond those presented to the grand jury." *United States v. Blanchard*, 542 F.3d 1133, 1143 (7th Cir. 2008). That is, a constructive amendment can be demonstrated if the "proof at trial 'goes beyond the parameters of the indictment in that it establishes offenses *different from* or *in addition to* those charged by the grand jury.'" *United States v. Pigee*, 197 F.3d 879, 886 (7th Cir. 1999) (quoting *United States v. Willoughby*, 27 F.3d 263, 266 (7th Cir. 1994)) (emphasis added). "As such, we are primarily concerned with changes made to the indictment that affect elements of the crime." *United States v. Mitov*, 460 F.3d 901, 906 (7th Cir. 2006). The Fifth Amendment is not offended when a difference between the indictment and the proof at trial is insignificant, or a broadly worded indictment provides sufficient room for the evidence presented at trial. *See, e.g.*, *United States v. Trennell*, 290 F.3d 881, 887-89 (7th Cir. 2002) (holding that an indictment that referred to "wholesale quantities of cocaine and cocaine base" was sufficiently broad to include the specific quantities of drugs actually found by the jury). By contrast, reversal

is required where, although the conviction is within the statutory prohibition, it is outside the indictment, by which the theory of criminal liability effectively is narrowed. *See Stirone v. United States*, 361 U.S. 212, 213-14, 219 (1960) (reversing a conviction under a statute that prohibited interference with either the import or export of various products, where the indictment charged only that the defendant had interfered with importation, but evidence at trial and the jury instructions would have allowed the jury to convict on either basis); *Pigee*, 197 F.3d at 886-87 (reversing a conviction for "manufacturing, storing, distributing, or using" cocaine, when only "storing" was alleged in the indictment, but evidence of distribution was introduced at trial). Finally, even where we have found a constructive amendment, we have not reversed if the error is harmless because the defendant was unable to show that the outcome of his trial would have been different if the constructive amendment had not occurred. *See United States v. Murphy*, 406 F.3d 857, 861 (7th Cir. 2005) (affirming where an indictment charged that a defendant had used "physical force," but the jury instruction also permitted a conviction if he had used less severe "intimidation," reasoning that "the jury would have obviously reached the same result because there was strong evidence of physical force and injury").

In order to assess Mr. Natour's contention, we must examine and compare the statute of conviction, the indictment, the proof at trial and the specific jury instruction. Mr. Natour was charged with a violation of 18 U.S.C. § 2314, which provides, in relevant part:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been *stolen, converted or taken by fraud* . . . [s]hall be fined under this title or imprisoned not more than ten years, or both.

*Id.* (emphasis added). This section provides no definition for the terms "stolen," "converted" or "taken by fraud."

The indictment charged Mr. Natour with five separate counts under the same statute, for transporting across state lines cell phones with a value in excess of $5,000, "knowing the same to have been stolen and converted."[8] The indictment does not allege explicitly that the cell phones in question may have been "taken by fraud." According to Mr. Natour, however, the Government's evidence at trial was intended to demonstrate that the phones had been acquired by fraudulent means. In reaching this conclusion, Mr. Natour relies heavily on Stock's testimony on behalf of Sprint that, for purposes of internal accounting, many of the phone "purchases" for which Sprint ultimately adjusted accounts were categorized as involving fraud. Mr. Natour treads carefully with this argument, however, because he also disputes whether there was sufficient evidence to determine that the phones were taken by fraud.

The jury was charged using a Seventh Circuit pattern jury instruction defining the term "stolen":

---

[8] R.116 at 1-5.

> The word "stolen" as used in these instructions means any taking with the intent to deprive the owner of his or her rights and benefits of ownership. The taking may be accomplished through the use of false pretenses, trickery, or misrepresentation in obtaining possession. It is not necessary, however, that the taking be initially unlawful. Even if possession is first acquired lawfully, the taking falls within the meaning of "stolen" if the defendant thereafter forms the intent to deprive the owner of his or her ownership [interests].[9]

In Mr. Natour's view, the Government limited its theory of the case by indicting him on narrower grounds than the statute would have permitted, specifically, by eliminating the term "taken by fraud." He further asserts that the proof at trial, which was suggestive of fraud, combined with an instruction that explicitly re-broadened the theory of liability to include transfer of property acquired by fraud, amounts to an impermissible constructive amendment of the indictment, in violation of his right under the Grand Jury Clause.

Mr. Natour invites our attention to *United States v. Sayan*, 968 F.2d 55 (D.C. Cir. 1992), a case involving the same statute of conviction. In *Sayan*, the indictment charged that the defendant had transported money known to have been "taken by fraud," without reference to the other statutory language in § 2314. *Id.* at 59. The

---

[9] R.192 at 170.

jury was instructed, however, that if the money in question had been acquired through *any* of the means listed in § 2314, it would be sufficient to convict. On appeal, the defendant claimed that the indictment had been constructively amended. *Id.* The District of Columbia Circuit noted that, although it was "conceivabl[e]" that this instruction "could have broadened the theories regarding the method [the defendant] used to achieve [her] end" from that presented in the indictment, the proof at trial was limited to fraud; therefore, no constructive amendment had occurred. *Id.* at 60.

We do not read *Sayan* to conclude that the statutory terms *must* be read as entirely distinct, with no intersection or overlap. The District of Columbia Circuit's conclusion is merely that such a result is "conceivabl[e]," under some circumstances that were not presented to it. *Id.* Moreover, the tentative nature of that conclusion was further qualified by the court through the addition of a footnote in which it specifically declined to address the scope of the statutory terms and cited cases that "might support a conclusion that the phrase 'taken by fraud' as used in Sayan's indictment encompasses 'stolen, converted or taken by fraud.'" *Id.* at 60 n.5. The statement in *Sayan* that Mr. Natour reads as supportive of his view, is, therefore, not as definitive as he would have us conclude. We therefore turn to a more detailed examination of the history of § 2314 and the case law interpreting it.

Section 2314 was enacted in 1934 as the National Stolen Property Act (the "Act"). At that time, the Act's

prohibition employed similar—though not identical—language to the current version under which Mr. Natour was charged. Specifically, the 1934 Act made it a crime to "transport or cause to be transported . . . any goods, wares or merchandise, securities or money, of the value of $5,000 or more, *thereto fore stolen or taken feloniously by fraud or with intent to steal or purloin.*" *See* National Stolen Property Act, § 3, Pub. L. No. 73-246, 48 Stat. 794, 794-95 (May 22, 1934) (emphasis added). The section was revised in 1939, in response to a letter from the Attorney General in which he noted that it would be "desirable to include within [the statute's] provisions property, money, or securities that have been embezzled as well as those that have been stolen." S. Rep. No. 76-674, at 1 (1939). The resulting amendment included, for the first time, language relating to property "feloniously converted." Pub. L. No. 76-255, 53 Stat. 1178, 1178 (Aug. 3, 1939).

Interestingly, the original 1934 Act was drafted as an act "to extend the provisions of the National Motor Vehicle Theft Act to other stolen property." H. Rep. No. 73-1599, at 1 (1934) (Conf. Rep.); *see also Dowling v. United States*, 473 U.S. 207, 218-20 (1985) (describing the history of the National Stolen Property Act). The National Motor Vehicle Theft Act, enacted in 1919 and codified at 18 U.S.C. § 2312, consistently has punished the transportation in interstate commerce of motor vehicles known to be "stolen," without further expansion of the terms parallel to those contained in the National Stolen Property Act. *See* Pub. L. No. 66-70, 41 Stat. 324, 325 (1919). The Supreme Court has held that the term "stolen" as

it is used in the National Motor Vehicle Theft Act encompasses activities involving virtually any illegally acquired property, regardless of the specific means. In *United States v. Turley*, 352 U.S. 407, 417 (1957), the Court specifically rejected an interpretation that would have limited the statute to common-law larceny and held that the statute punishes "all felonious takings" of property within the statute's reach. Notably, the Court specifically emphasized that "'steal' 'may denote the criminal taking of personal property either by larceny, embezzlement, or false pretenses.'" *Id*. at 412 (quoting Black's Law Dictionary (4th ed. 1951)). Indeed, the Court emphasized that "'stolen' and 'steal' have been used in federal criminal statutes, and the courts interpreting those words have declared that they do not have a necessary common-law meaning coterminous with larceny and exclusive of other theft crimes." *Id.* The Court quoted with approval the comment of the Court of Appeals for the Fourth Circuit that "steal" has become "'the generic designation for dishonest acquisition.'" *Id.* (quoting *Boone v. United States*, 235 F.2d 939, 940 (4th Cir. 1956)). Finally, the Court also noted that the practice of the federal courts comported with generally accepted dictionary usage. Consequently, although amendment of the National Stolen Property Act ostensibly was intended to clarify the breadth of its coverage, the act from which it originated has been interpreted to reach equally as far, without the addition of terms related specifically to conversion or fraud.

Shortly after *Turley*, the Fifth Circuit considered the reach of the statutory term "stolen" in § 2314. *Lyda v.*

*United States*, 279 F.2d 461, 463-65 (5th Cir. 1960), found *Turley* squarely applicable. In *Lyda*, the defendant was charged in an indictment referencing only "stolen" property, while he claimed that the evidence at trial demonstrated clearly that he had embezzled, rather than stolen, a truckload of pecans. The Fifth Circuit found the distinction irrelevant in the context of § 2314. The court concluded that

> [t]he term "stolen" as used here is certainly as comprehensive as "theft" which, we have said, "is not like 'larceny', a technical word of art with a narrowly defined meaning but is, on the contrary, a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile."

*Id.* at 464 (quoting *Edwards v. Bromberg*, 232 F.2d 107, 110 (5th Cir. 1956). Furthermore, the court continued,

> [w]hile we need not here draw upon the adjacent terms of "converted or taken by fraud" as they appear in § 2314, we think their presence is relevant. The aim of the statute is, of course, to prohibit the use of interstate transportation facilities for goods having certain unlawful qualities. This reflects a congressional purpose *to reach all ways* by which an owner is wrongfully deprived of the use or benefits of the use of his property. It was one way to meet the difficulties in legislative draftsmanship. . . . Congress by the use of broad

terms was trying to make clear that if a person was deprived of his property by unlawful means amounting to a forcible taking or a taking without his permission, by false pretense, by fraud, swindling, or by a conversion by one rightfully in possession, the subsequent transportation of such goods in interstate commerce was prohibited as a crime. Since the aim of Congress was to reach all such deprivations, *it would distort that purpose if by a sort of reverse process the transaction under review had to consider whether the property was stolen or converted or taken by fraud*. The contiguous presence of all three descriptives lends meaning to each.

*Id.* (emphasis added) (citations omitted) (internal quotation marks omitted); *see also United States v. Long Cove Seafood, Inc.*, 582 F.2d 159, 163 (2d Cir. 1978) (calling a broad reading of the term "stolen" in § 2314, borrowed from *Turley*'s interpretation of § 2312, "relatively well-established").

In light of the Act's history and the Supreme Court's decision in *Turley*, we, like the Fifth Circuit in *Lyda*, are not inclined to read the term "stolen" to narrow artificially its meaning. The most natural reading of the statute, and the one we adopt, views the three descriptive terms as containing a significant amount of overlap. "Stolen" is broad enough to encompass the kind of fraudulent taking the evidence in this case supported.

The alternative interpretation, favored by Mr. Natour, is that, whatever "stolen" means, it must at the very least

exclude anything within the definition of "converted" or "taken by fraud." *See* Appellant's Br. 21-22 & n.4. In support of this argument, Mr. Natour relies principally on the familiar canon of construction that, in interpreting ambiguous statutory language, courts should strive to give meaning to every word and should reject any interpretation that renders any portion of the statute superfluous. *See, e.g.*, *United States v. Menasche*, 348 U.S. 528, 538-39 (1955); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992).

We are not persuaded that the canon commands that we adopt a meaning of the terms that understands each as entirely distinct. As the Supreme Court has reminded us,

> canons are not mandatory rules. They are guides that "need not be conclusive*." Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001). They are designed to help judges determine the Legislature's intent as embodied in particular statutory language. And other circumstances evidencing congressional intent can overcome their force.

*Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001); *see also Connecticut Nat'l Bank*, 503 U.S. at 253-54 ("Redundancies across statutes are not unusual events in drafting, and so long as there is no positive repugnancy between two laws, a court must give effect to both." (citation omitted) (internal quotation marks omitted)); *id.* ("[C]anons of construction are no more than rules of thumb that help courts determine the meaning of legislation . . . ."). Section 2314 does include duplication and

even redundancy for the sake of clarity and completeness. Any violation of the canon of construction caused by the most sensible reading of the statute is otherwise supported by the history and precedents.

Finally, Mr. Natour asserts that any ambiguity in the meaning of the statute requires the court to employ the rule of lenity in favor of Mr. Natour. As the Supreme Court has cautioned, however, "we have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." *Moskal v. United States*, 498 U.S. 103, 108 (1990) (citation omitted) (internal quotation marks omitted) (rejecting a plea for application of the rule of lenity to § 2314 after concluding that the defendant's conduct unambiguously fell within the statute). Our review of the appropriate sources leaves us with no such ambiguity.

Because we conclude that the terms included within the indictment were themselves sufficiently broad enough to encompass goods "taken by fraud," we also must conclude that the proof at trial and the jury instructions did not constructively amend Mr. Natour's indictment. The district court did not plainly err in instructing the jury using a related pattern instruction that incorporated "fraud" into the definition of "stolen."[10]

---

[10] Although Mr. Natour separately contends that there was insufficient evidence that the phones were either "stolen" or

(continued...)

**B. Enhancement for Being "In the Business of Receiving and Selling Stolen Property"**

Mr. Natour next challenges the district court's determination that he "was a person in the business of receiving and selling stolen property" and therefore subject to a 2-level increase in his guidelines calculation at sentencing. *See* U.S.S.G. § 2B1.1(b)(4). Mr. Natour submits both that application of the enhancement is improper on the merits and that the district court's treatment of the matter was so insufficient as to be procedurally unreasonable. The district court's findings of fact stand unless clearly erroneous; however, we review de novo whether the facts as found are sufficient to support an enhancement under the Guidelines. *United States v. Pabey*, 664 F.3d 1084, 1094 (7th Cir. 2011). We also review de novo whether a district court committed procedural error, such as by failing to explain adequately its sentencing determinations. *United States v. Olmeda-Garcia*, 613 F.3d 721, 723 (7th Cir. 2010).

The application notes for § 2B1.1(b)(4) provide:

> For purposes of subsection (b)(4), the court shall consider the following non-exhaustive list of factors in determining whether the defendant was in the business of receiving and selling stolen property:

---

[10] (...continued)

"converted" as those terms were used in the indictment, we consider this submission to be simply a repackaging of his statutory interpretation argument. We therefore are not persuaded for the reasons already identified.

(A) The regularity and sophistication of the defendant's activities.

(B) The value and size of the inventory of stolen property maintained by the defendant.

(C) The extent to which the defendant's activities encouraged or facilitated other crimes.

(D) The defendant's past activities involving stolen property.

U.S.S.G. § 2B1.1, cmt. 5.

The sentencing transcript includes relatively little on this question, although, in the context of Mr. Natour's argument below, it is not surprising. In response to the recommendation of the PSR that the enhancement apply, the portion of Mr. Natour's sentencing memorandum addressing this subject consists of only four sentences, the essence of which is that he "was involved in legitimate business in addition to also being involved in the instant offense. This section of the fraud statute was designed with the 'fence' in mind and we submit that the evidence does not support such an increase."[11] At

---

[11] R.157 at 6. The Government's memorandum provided a fuller analysis of the relevant guideline section and Mr. Natour's conduct. *See* R.161 at 5-8. The Government argued that Mr. Natour's conduct fell within all four of the Guideline's suggested factors, that Mr. Natour probably could be con-

(continued...)

the sentencing hearing, when defense counsel reached this point, he indicated that he was "not going to address further the in the business" enhancement, because the argument in the memorandum was "pretty straightforward."[12] As an initial response, the court stated simply, "[w]ell, I reject your argument."[13] It later returned to the subject, however, stating that the Guidelines posed "no question. He could have a legitimate business and still be in the business of buying and selling stolen property."[14]

When read in context, the court's treatment of the issue did not fall below acceptable procedural levels.[15]

---

[11] (...continued)
sidered a "fence" and that the Guideline does not exempt business owners who conduct some legitimate business in addition to their sale of stolen goods. R.161 at 6-7.

[12] R.186 at 19.

[13] R.186 at 19.

[14] R.186 at 39.

[15] We have stated that the district court's burden of ruling on an objection explicitly and providing a statement of reasons need not result in lengthy discussion and imposes only a "minimal burden," *United States v. Sykes*, 357 F.3d 672, 674 (7th Cir. 2004):

> Federal Rule of Criminal Procedure 32(i)(3) requires a district court to rule on all controverted matters that will affect sentencing. This requirement ensures that the court addresses all of the defendant's objections and provides a record of how the objections were

(continued...)

Although the court did not analyze extensively all the factors listed in the application note, it did address the principal objection that Mr. Natour raised—that he operated a legitimate business and was not a professional "fence."[16] Moreover, on the facts, application of the

---

[15] (...continued)

> resolved for later reference. But Rule 32 does not impose an onerous burden. The district court can often satisfy the rule by adopting the proposed findings in the presentence report (PSR), even as to contested facts, so long as the PSR articulates a sufficiently clear basis for the sentence, and the reviewing court can be sure that "the district court made a decision of design rather than of convenience."

*Id.* (citations omitted).

[16] Although Mr. Natour's brief to the district court was not clear on this point, the "fence test" was the test previously used in this circuit to determine the applicability of the Guideline, and it referred to the difference between selling goods one had stolen himself versus professionally selling goods unlawfully acquired by others. *See, e.g.*, *United States v. Braslawsky*, 913 F.2d 466, 468 (7th Cir. 1990) (stating that only the latter category of criminal warranted the Guidelines enhancement). The Guidelines were amended in 2001 to adopt the totality of the circumstances test embodied in the current application note. Moreover, it is undisputed that Mr. Natour both *received* and *sold* unlawfully acquired property; indeed, he admitted that he bought the phones in question from Williams. Therefore, to the extent that the question whether a person is a "professional fence" is still relevant, *see*

(continued...)

enhancement appropriately accounts for the scope of Mr. Natour's illegal conduct. Mr. Natour was convicted of making four large shipments of illegally obtained phones in less than a one-month period. In his initial statement to police, he admitted to dealing roughly 1500 phones so acquired. The value of those phones was estimated to be somewhere between $100,000 and $300,000. Further, in order to operate his end of the illegal business, others had to obtain illegally phones for him and still others had to sell to consumers the phones so obtained; thus, his behavior encouraged additional criminal conduct. Mr. Natour also operated a legitimate business that contained legitimate inventory, but there is simply no reason that operation of a separate, legitimate enterprise undermines the fact that, over a period of several months, he engaged in a pattern of serious criminal conduct involving a significant quantity of stolen goods. Under these circumstances, application of the Guideline was not erroneous.

## C. Loss Calculation

Mr. Natour's final contention is that the district court erred in calculating the amount of loss caused by his offense, and, in so doing, improperly calculated the applicable guidelines range. "We review the district

---

[16] (...continued)
*United States v. Vigil*, 644 F.3d 1114, 1120-21 (10th Cir. 2011), Mr. Natour clearly engaged in conduct that fell within the Guideline.

court's interpretation and application of the guidelines de novo and its findings of fact for clear error." *United States v. Sutton*, 582 F.3d 781, 783-84 (7th Cir. 2009). The district court's loss calculation itself, "which need only be 'a reasonable estimate of the loss,'" is reviewed for clear error. *Id.* at 784 (quoting U.S.S.G. § 2B1.1 cmt. 3(C)).[17]

---

[17] The language of the Guideline refers only to "loss." § 2B1.1(b)(1). The commentary clarifies that "loss" is "the greater of actual loss or intended loss." *Id.* cmt. 3(A). The commentary continues:

> (i) Actual Loss.--"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
>
> (ii) Intended Loss.--"Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).
>
> . . . .
>
> (B) Gain.--The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.
>
> (C) Estimation of Loss.--The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. *See* 18 U.S.C. § 3742(e) and (f).

(continued...)

In order to understand his objection, it is necessary to examine the sentencing proceedings on loss amount in some detail.

Beginning with the PSR and the responses by the parties and continuing through the sentencing hearing,

---

[17] (...continued)

The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:

(i) The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.

(ii) In the case of proprietary information (*e.g.*, trade secrets), the cost of developing that information or the reduction in the value of that information that resulted from the offense.

(iii) The cost of repairs to damaged property.

(iv) The approximate number of victims multiplied by the average loss to each victim.

(v) The reduction that resulted from the offense in the value of equity securities or other corporate assets.

(vi) More general factors, such as the scope and duration of the offense and revenues generated by similar operations.

*Id.* cmt. 3.

numerous bases for the loss amount were proposed and considered, among them proven loss to Sprint, gain to the defendant as profit and fair market value of the property. The PSR recommended basing the loss amount on the adjustments made to Sprint accounts to which Stock had testified, namely, $104,742.16. Mr. Natour proposed various numbers before the district court in loss calculation ranging between $0 and $70,000.[18] The Government urged that the loss amounts should be the total value of the phones as estimated by Sprint (as the manufacturer's suggested retail price or "MSRP"), and contended that the amount was $302,000; in the alternative, the Government suggested using "gain" to the defendant as a measure, as estimated by the cash-on-delivery amounts received for the four convicted counts, resulting in a loss of roughly $136,000. The defendant objected that the cash-on-delivery or MSRP estimates, which would value each phone around $200, were unrealistic: "nobody is getting two, $300

---

[18] Mr. Natour apparently based this figure on the Guidelines rather than a particular interpretation of facts relevant to loss. In his response to the PSR, he stated that although he was "not in a position to suggest to the Court an exact dollar amount that would more accurately reflect the actual loss" than that of the PSR, "based on the nature of the business and the potential recovery of their loss . . . the real figure should be well below the $70,000 amount required to increase the level by 8," referring to the breaking points in the Guidelines chart. R.157 at 5-6.

for these phones, whether legitimate or otherwise."[19]
The court responded:

> Well, apparently they were because that's what
> they were, had to pay on these. So if that isn't a
> reasonable value for the rest of the phones, why
> isn't it up to you to show that it isn't? My only
> concern is that you don't actually, you don't
> know who suffered the loss, and so I suppose
> we don't know how much it is.
>
> But if it's fair to do it as a fair retail value and
> that's a fair measure of damages, then I think
> we've got pretty good evidence that that's what
> they actually had to pay back. Obviously some
> people bought them at that price, enough people
> that they paid back 100 some thousand dollars.
>
> I think I'm going to go with the government's
> figures. I don't have anything else really to go by.
> I'm not going to—I can't go out on the street and
> say, "How much are you selling them for?" And
> the fact that they may have deals, that just, I think
> it's supposed to be an approximation. They have
> more than an approximation on a third of those
> phones. So you can take out the ones on that one
> count if you want. I don't know if it makes
> much difference.
>
> [COUNSEL FOR DEFENDANT]: So I apologize,
> then, Judge. Which numbers is the Court going
> to use?

---

[19] R.186 at 29.

> THE COURT: The government's 300 some thou-
> sand minus the 50 phones or whatever it was,
> 55 phones. I doubt that that makes any big dif-
> ference, but maybe it does. I don't know.[20]

The resultant sentence, therefore, took the Government's figures, based on the MSRP, for all phones associated with the charges of conviction, thus omitting from that estimate only the 55 phones associated with the dismissed Count 4.

Mr. Natour now argues that the district court effectively "g[a]ve up"[21] and accepted the Government's figures without adequate explanation. He also contends that the loss calculation is clearly erroneous.

First, reading the sentencing proceedings as a whole, we are not persuaded that the district court failed to adequately explain its reasoning. Mr. Natour is correct that the ruling is not a model of clarity. The court certainly struggled to put a number to the loss, but also clearly was dissatisfied with a number that reflected only the 379 phones upon which an adjustment had been made by Sprint. The court acknowledged that, although Sprint had not documented further losses, the remainder of the phones were taken unlawfully and someone had sustained a loss, the reasonable value of which could be extrapolated from the known losses with respect to a portion of the phones. Reading the transcript as a whole,

---

[20] R.186 at 29-30.

[21] Appellant's Br. 40.

the district court did not provide so scant a rationale as to deprive us of a reasonable basis for review. *See United States v. Leiskunas*, 656 F.3d 732, 738 (7th Cir. 2011) (remanding for a rationale when the district court provided no reasoning whatsoever for a loss amount).

With respect to the substance of the calculation, we also perceive no reversible error by the district court. First, "[t]he court need only make a reasonable estimate of the loss," U.S.S.G. § 2B1.1(b)(1), cmt. 3(C), and, in arriving at that figure, may employ an "approximate number of victims multiplied by the average loss to each victim," *id.*, cmt. 3(C)(iv). That is, the Guidelines specifically contemplate that exact figures will not always be available and among other acceptable methods of arriving at an approximation, is one in which limited evidence is scaled to reflect the scope of the loss involved. Accordingly, the district court was not required to limit its loss figure to the amount that reflected only the 379 phones associated with an adjustment from Sprint. Furthermore, the inclusion of the additional phones at similar costs was supported by record evidence that phones not associated with an "adjustment" still resulted in a loss to someone. Specifically, the evidence established that if phones were purchased through fake businesses and the accounts with Sprint were in default, the accounts would not have appeared as "adjusted" to reflect an unauthorized charge and thus would not have appeared in the total, although Sprint would have suffered a loss; this is consistent with Mr. Natour's post-arrest statement about obtaining phones from Williams. Similarly, if a consumer, likely a business with large bills, failed

to notice or report an unauthorized line-item charge, the account would not be adjusted, but the customer would have paid for a phone it did not receive; this is consistent with the evidence that Mr. Natour received phones ordered by "Frito-Lay" on a corporate account not associated with an adjustment.[22] The district court, therefore, did not err in accounting for all of the phones related to the charges of conviction.

Although we find no error in the inclusion of these phones, we still must determine if the estimate itself is clearly erroneous. "A defendant challenging a district court's loss calculation must not only demonstrate that it is inaccurate, but also outside the realm of permissible computations." *United States v. Kimoto*, 588 F.3d 464, 493-94 (7th Cir. 2009) (internal quotation marks omitted). On this point, Mr. Natour's argument also falters: We have accepted fair market value of stolen goods as a reasonable estimate of loss. *See United States v. Wasz*, 450 F.3d 720, 727 (7th Cir. 2006). We also find persuasive a factually similar case in which the Fifth Circuit approved of a loss calculation based on the "fair market value" of stolen goods and explicitly rejected a "replacement value" or "wholesale value" calculation that reflects the lower amount Sprint would have to pay a wholesaler to replace the phones. *See United States v. Lige*, 635 F.3d 668, 671-72 (5th Cir. 2011). For reasons similar to those expressed in *Lige*, we would be suspicious of a figure that was based on, for example,

---

[22] *See* R.186 at 25 (Government's explanation of losses not covered by adjustments).

the cash-on-delivery value or the discounted price at which Sprint might have chosen to offer phones to customers in exchange for a service contract. As our colleagues in the Fifth Circuit reasoned in *Lige*, the victims here were not in the business of selling phones at cost. The phone had a greater value to the victim and an economically realistic measure of that value is the price for which that phone could be "sold" in its business, either as an outright sale to retail customers or as an inducement to enter a long-term service arrangement with that customer. The retail value of the phone is an "economically realistic" measure of the monetary loss to the victim. *Lige,* 635 F.3d at 671.

The district court's singular task was to value the goods in order to estimate the loss to the victim, and the method chosen by the court here, among the available options under the facts of this case, rests on solid ground.

Although the district court's reasoning was discernible in context and its result not clearly erroneous, we nevertheless believe that this case presents us with an opportunity to respectfully remind district courts that cost calculations should be undertaken with great care and with maximum possible clarity of the record.

### Conclusion

The judgment of the district court is affirmed.

AFFIRMED