In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3641

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIAM BOSWELL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cr-00098-WTL-MJD-1 — **William T. Lawrence**, *Judge.*

ARGUED SEPTEMBER 16, 2014 — DECIDED NOVEMBER 26, 2014

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges.*

BAUER, *Circuit Judge*. A jury convicted defendant-appellant, William Boswell ("Boswell"), of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The district court sentenced Boswell under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), to 235 months—a bit over nineteen and a half years—imprisonment, with a five-year term of probation to follow. Boswell challenges both his conviction and sentence on appeal. In regard to his conviction,

he argues that the district court committed reversible error when it permitted the government to elicit testimony regarding a tattoo of a firearm that he had on his neck. As to his sentence, Boswell maintains that the prior convictions used to characterize him as an armed career criminal under § 924(e) were not charged in the indictment and proven beyond a reasonable doubt to the jury, in violation of his Fifth and Sixth Amendment rights. For the reasons set forth in this opinion, we affirm.

## I.  BACKGROUND

On June 20, 2012, a federal grand jury returned a single-count indictment charging Boswell with being a felon in possession of two firearms (two revolvers) on January 26, 2011. The charge stemmed from an investigation of Boswell that law enforcement launched in December 2010. Boswell proceeded to trial on the charge and, after two days of trial, the jury found him guilty. The following facts are recited from the testimony and evidence produced at trial.

In December 2010, the Anderson, Indiana, Police Department received a tip from Jasmine White ("White") that Boswell, a prior convicted felon, was in possession of firearms available for purchase. White testified that she first met Boswell in 2010, while working as a bartender at a bar that Boswell frequented. She became more familiar with Boswell after he began dating one of her friends, Chelsea Cunningham ("Cunningham"). Eventually, Boswell and Cunningham began staying nights at White's residence, and ultimately Cunningham took over White's lease, living in the home with Boswell, her son, and Monte Laswell (Boswell's cousin) thereafter. White testified that she began to observe Boswell treating

Cunningham and her son poorly and she became concerned for Cunningham's safety. For this reason, White decided to alert the police upon discovering that Boswell was trying to sell firearms.

On the basis of White's tip, law enforcement planned a sting operation. Special Agent John O'Boyle ("O'Boyle") of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") headed the operation. The initial plan called for Special Agent Jeremy Godsave ("Godsave"), also ATF, to make an under-cover purchase of firearms from Boswell directly. However, when Boswell indicated to White that he would only sell to someone he knew, the plan changed—White agreed to make the purchase while accompanied by Godsave, who would remain at a distance. The operation went forward in this manner on January 26, 2011:

> To set-up the firearms transaction, White made a recorded phone call to Boswell in the presence of O'Boyle and Godsave. She asked Boswell if he was still home and if he still had guns to sell. The mate-rial part of the call is as follows:
>
> White: Ok, so I just come by and grab them then and just bring them back to you?
>
> Boswell: Yeah, you can, yeah you can come by and grab them. That's what I'm telling you, you can come by and get them. I understand he ain't going to pay for them. He's gotta see what he getting him.

Thereafter, White was equipped with an audio and visual recorder on her person, and Godsave was outfitted with an

audio recording device. White and Godsave then drove to Boswell's residence. Upon arrival, White walked up to the front door of the home, while Godsave waited in the car parked out front. Boswell met White at the door and let her inside. White reported that Cunningham, Cunningham's mother and son, and Monte Laswell were also present in the home. Boswell led White into the kitchen, where he reached into a cabinet and retrieved a brown paper sack, which contained the two firearms listed in the indictment. Boswell gave the guns to White and she made her way out. Upon her return to the undercover vehicle, White gave the guns to Godsave and made a second recorded phone call to Boswell after Godsave had inspected the weapons. Both White and Godsave spoke with Boswell during this call, which concerned how the firearms worked, whether they were tied to any crimes, the purchase price, and whether Boswell could acquire more guns to sell. After Boswell and Godsave came to terms on price, White returned to the home to make the payment. Boswell met White at the front door, she gave him the money, and he indicated that next time he would deal with Godsave directly. This brief conversation was picked up by the audio recording device on White's person.

At trial, White, O'Boyle, and Trena Murphy ("Murphy"), Boswell's Indiana state probation officer, each identified Boswell's voice as that of the "male seller" on the audio recordings made incident to the sting operation. White testified that she had "no doubt" that it was Boswell's voice on the recordings. Murphy testified that she was able to identify Boswell's voice on the recordings as a result of having previously spoken with him over the phone and at a number of

probation-related meetings. Murphy also linked Boswell to the phone number that White dialed to contact the gun seller. O'Boyle testified that he was able to identify Boswell's voice, in part, on account of having conducted an unrecorded 10–15 minute interview with Boswell on October 11, 2011, during which Boswell confessed to the firearms sale that occurred on January 26, 2011.

At trial, Cunningham testified on Boswell's behalf. She stated that she had never seen firearms in their home, that she had never seen Boswell handle a gun, that Boswell did not abuse her or her son, and that there was no reason to believe such abuse occurred. On cross-examination, Cunningham admitted that she was not paying attention to the events that took place between Boswell and White while they were in the kitchen, as she was focused on her son at the time.

Boswell chose to take the stand. On direct examination, he admitted to having a number of felony convictions, including two Florida battery convictions, an Indiana aggravated battery conviction, a conviction for dealing in stolen property, and a conviction for conspiracy to introduce marijuana into a prison facility. Boswell denied ever possessing any guns subsequent to his first felony conviction and, in doing so, stated, "I don't mess with weapons." Although he admitted to speaking with O'Boyle in October 2011, he denied giving any sort of confession at that time. Rather, according to Boswell's testimony, he told O'Boyle, "I ain't never sold no guns … I don't use weapons." On cross-examination, the government confronted Boswell with the audio recordings made incident to the January 26, 2011, sting operation. Boswell denied that it was his voice on the recordings and proceeded to challenge the

credibility of the government's voice identification witnesses, explicitly calling White, O'Boyle, and Murphy liars. The government then sought permission from the district court to ask Boswell about a tattoo of a firearm (a revolver) that he had on his neck. After the district court overruled defense counsel's objection to the proposed inquiry, the cross-examination of Boswell proceeded as follows:

> Government: I believe you testified on your direct that you don't even like guns, correct?

> Boswell: Yes, sir.

> Government: Not since your grandfather committed suicide, correct?

> Boswell: Yeah.

> Government: Well, if you don't like guns so much, why do you have a tattoo of one up there on your neck?

> Boswell: Because it's back in the westerns. I like to gamble; and it's part of a western thing with cards, poker and dice.

> Government: But you do have a tattoo of a revolver, correct?

> Boswell: I have a tattoo of a 4-barrel Dillinger, yes, sir.

> Government: On your neck?

> Boswell: Yes.

> Government: A person who doesn't like guns?

> Boswell: I got it before my grandfather passed away, yes, sir.

In its closing argument, the government commented on the motivations, testimony, and demeanor of White and Boswell. Specifically, in regard to Boswell, the government highlighted his five prior felony convictions and firearm tattoo to demonstrate that his testimony had been dishonest. Defense counsel's closing argument focused on credibility; in particular, the defense attacked White's credibility, stating that the evidence "would support the conclusion that [White] has been exposed as a monumental liar." In rebuttal, the government rehashed its argument that Boswell's prior felony convictions and firearm tattoo made his testimony incredible.

The jury returned a verdict of guilty. The district court entered a judgment in accordance with the verdict. The presentence report ("PSR"), issued in anticipation of sentencing, recommended that Boswell be sentenced as an armed career criminal pursuant to 18 U.S.C. § 924(e). Under § 924(e) any "person who violates section 922(g) … and has three previous convictions … for a violent felony … shall be fined as provided in this title, imprisoned not more than 10 years, or both."). Boswell objected to the PSR's classification of him as an armed career criminal under § 924(e) on a number of grounds, *inter alia*, that his two Florida convictions could not be counted for the purposes of the ACCA because they were not charged in the indictment and proven beyond a reasonable doubt to the jury. The district court dismissed Boswell's objections, determined that Boswell qualified as an armed career criminal under § 924(e), and sentenced him to a term of

235 months imprisonment, with a five-year term of probation to follow. Boswell now appeals.

## II.  DISCUSSION

Boswell raises two challenges on appeal: one that goes to his conviction, the other to his sentence. We first tackle Boswell's contention that his conviction must be reversed because the district court erroneously permitted the government to elicit testimony regarding his firearm tattoo.

### A.  Admission of the Firearm Tattoo Testimony

As discussed above, Boswell chose to waive his Fifth Amendment right and testify in his own defense. On direct examination, Boswell was asked, "Have you possessed any firearms since you obtained your first felony conviction?" To which he responded, "No, sir. I don't mess with weapons." Boswell further stated on direct, "I'm a fighter. I don't use weapons." On cross-examination, the government sought to elicit testimony from Boswell regarding a tattoo of a revolver that he had inked to his neck. In a bench conference, the following exchange took place:

> Government: I'll ask this. I believe the defendant indicated on his direct testimony that he doesn't like guns, that ever since his grandfather committed suicide he doesn't like them. I'm going to inquire as to his tattoo. … I think that goes to his credibility, which he's made an issue by taking the stand.
>
> Defense Counsel: It's too much of a stretch between a picture of a gun and a gun. … [j]ust because he owns a picture of a gun and it happens to be on his

> skin I don't think is enough of a connection to impeach it as that.
>
> The Court: I don't think it's otherwise objectionable. I think it's fair game.

On appeal, Boswell insists that the district court committed reversible error in permitting the government's proposed line of inquiry regarding his firearm tattoo. According to Boswell, the firearm tattoo testimony should have been excluded as irrelevant under Federal Rule of Evidence 401. In the alternative, he claims that even if relevant, the firearm tattoo testimony should have been excluded under Federal Rule of Evidence 403 because the risk of unfair prejudice it engendered significantly outweighed its probative value. We first address the issue of relevancy.

### 1. Relevance and Rule 401

We agree with Boswell that defense counsel's objection that any questions regarding Boswell's firearm tattoo were "too much of a stretch" or lacked "enough of a connection to impeach" squarely challenged the relevancy of the evidence. Because a timely objection was made on the basis of relevance, we review the district court's corresponding evidentiary ruling for abuse of discretion. We "will not substitute our opinion for that of the trial judge merely because we may be inclined to rule differently on the question of relevancy." *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012). Rather, a district court's evidentiary ruling "will be reversed 'only where no reasonable person could take the view adopted by the trial court.'" *United States v. Reese*, 666 F.3d 1007, 1015 (7th Cir. 2012) (quoting *United States v. Vargas*, 552 F.3d 550, 554 (7th Cir. 2008)). Given

the "low threshold" that Rule 401 comprehends for establishing that evidence is relevant, Boswell faces a significant obstacle in contending that the firearm tattoo testimony should have been barred as irrelevant. *See Boros*, 668 F.3d at 907; *see also United States v. McKibbins*, 656 F.3d 707, 711 (7th Cir. 2011) ("[A]ll relevant evidence is admissible and the Rules define relevance broadly."); *Int'l Merger Acquisition Consultants, Inc. v. Armac Enters., Inc.*, 531 F.2d 821, 823 (7th Cir. 1976) (relevancy standard is liberal).

The government maintains, as it did before the district court, that the firearm tattoo inquiry was relevant to impeach Boswell's credibility, which he put in issue when he elected to testify. The district court accepted the government's position. Because relevant evidence is admissible provided it is not otherwise proscribed by law or rule, *see* Fed. R. Evid. 402, the district court need only identify a legitimate basis for its ruling. *See United States v. Abel*, 469 U.S. 45, 56 (1984) ("[T]here is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible; quite the contrary is the case."). Accordingly, we begin—and end—our analysis with the district court's adopted justification.

The rule is well established that when a criminal defendant elects to testify in his own defense, he puts his credibility in issue and exposes himself to cross-examination, including the possibility that his testimony will be impeached. *See, e.g., Brown v. United States*, 365 U.S. 148, 154–55 (1958); *United States v. Tolliver*, 454 F.3d 660, 667 (7th Cir. 2006); *United States v. Chevalier*, 1 F.3d 581, 583 (7th Cir. 1993); *United States v. Amaechi*, 991 F.2d 374, 379 (7th Cir. 1993); *United States v.*

*Studley*, 892 F.3d 518, 529 (7th Cir. 1989); *United States v. Covelli*, 738 F.2d 847, 856 (7th Cir. 1984). Boswell chose to testify and, by doing so, he thrust his credibility in issue. The government, in turn, was entitled to impeach Boswell's testimony, *i.e.*, cast doubt upon his credibility as a witness. *See Black's Law Dictionary* (9th ed. 2009) (defining "impeachment evidence" as "evidence used to undermine a witness's credibility"). Impeachment can be effected in a number of ways, including contradiction, which involves presenting evidence that the substance of a witness's testimony is not to be believed. *See, e.g., United States v. Douglas*, 408 F.3d 922, 928 (7th Cir. 2005); *United States v. Poole*, 207 F.3d 893, 898–99 (7th Cir. 2000); *United States v. Lindemann*, 85 F.3d 1232, 1243 (7th Cir. 1996); *United States v. Kozinski*, 16 F.3d 795, 805 (7th Cir. 1994). Therefore, the question for us to resolve is whether the government's firearm tattoo-related inquiry had any tendency to impeach, or cast doubt upon, the truthfulness of Boswell's trial testimony. *See* Fed. R. Evid. 401. As we view the matter, it did.

Boswell, in defending himself on direct examination, sought to cast himself as someone who steers clear of guns, asserting "I don't mess with" and "I don't use" weapons—guns, in this case. Such a strategy was not without risk, however. By portraying himself as someone who generally does not associate with guns, Boswell "opened the door" for the government to cross-examine and impeach him on that testimony. *See Douglas*, 408 F.3d at 928; *Poole*, 207 F.3d at 898–99; *Taylor v. National R.R. Passenger Corp.*, 920 F.2d 1372, 1375 n.3 (7th Cir. 1990); *United States v. Gaertner*, 705 F.2d 210, 216 (7th Cir. 1983). And, that's what the government did on cross-examination. After Boswell affirmed the government's

characterization of his direct testimony as stating he did not "like guns," the government asked him about his firearm tattoo. Although it may well be impossible to ascertain an individual's subjective motive or reasons for getting any particular image memorialized on his or her skin, this does not render the firearm tattoo testimony without impeachment value, as Boswell seems to claim. Rather, a jury may draw a number of reasonable inferences from the tattoo evidence. Prominent among such inferences is that Boswell maintained some degree of association with, or affinity for, guns—an inference which casts doubt upon his testimony that he does not "mess with" or "like" guns. Given the "low threshold" that Rule 401 comprehends, we cannot say that the district court abused its discretion when it allowed the government to ask Boswell about his firearm tattoo.

### 2. Unfair Prejudice and Rule 403

Boswell next argues that the government's inquiry regarding his firearm tattoo should have been excluded under Rule 403 of the Federal Rules of Evidence. Rule 403 permits the district court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice … ." Fed. R. Evid. 403. Since "'most relevant evidence is, by its very nature, prejudicial,' we have emphasized that evidence must be *unfairly* prejudicial to require exclusion." *United States v. Hanna*, 630 F.3d 505, 511 (7th Cir. 2010) (quoting *United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003)). "Evidence is unfairly prejudicial if it will induce the jury to decide the case on an improper basis rather than on the evidence presented." *United States v. Klebig*, 600 F.3d 700, 713 (7th Cir. 2009); *United States v. Rodgers*, 587 F.3d 816, 822 (7th

Cir. 2009). The amount of prejudice that is acceptable varies according to the amount of probative value the evidence possesses. *Vargas*, 552 F.3d at 557. Because Boswell's trial counsel did not lodge a specific objection or make any reference to prejudice during the bench conference, we review for plain error. *See United States v. Christian*, 673 F.3d 702, 707 (7th Cir. 2012). On review for plain error, Boswell must show (1) that the complained of error occurred, (2) that the error "was so obvious and so prejudicial that a district judge should have intervened without being prompted by an objection from defense counsel," and (3) that the error affected his "substantial rights—meaning that [he] likely would have been acquitted" absent the error. *United States v. Haldar*, 751 F.3d 450, 456 (7th Cir. 2014). "'Once these three conditions have been met, we may exercise our discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. LeShore*, 543 F.3d 935, 939 (7th Cir. 2008) (quoting *United States v. James*, 464 F.3d 699, 709 (7th Cir. 2006)). The plain error standard sets a tremendously high bar, indeed one far too high for Boswell's arguments to reach.

As indicated, the government's firearm tattoo-related inquiry bore on Boswell's credibility. After Cunningham, the only other defense witness, admitted that she was not paying attention to White and Boswell when the firearms transaction occurred, Boswell's testimony stood as the only evidence refuting the government's case. In other words, Boswell's credibility was not just in issue, but it was a major issue for the jury to consider. Through his testimony, Boswell sought his acquittal by placing before the jury the notion that he is

someone who deliberately steers clear of guns. Although the firearm tattoo evidence did not unequivocally fly in the face of his testimonial statements regarding his relationship with guns, it certainly cast doubt upon the truthfulness of those statements and his credibility as a witness. At the same time, however, the government's inquiry regarding Boswell's firearm tattoo did contain a significant prejudicial element. *See United States v. Thomas*, 321 F.3d 627, 631–33 (7th Cir. 2003) (holding the district court violated Rule 403 in permitting government to introduce a picture of defendant's gun tattoo on its case in chief, where defendant was charged with being a felon in possession and the court could not "see how the … photo of the tattoo was admitted for any purpose other than to establish [the defendant's] propensity to possess guns"). This, of course, is the crux of Boswell's "unfair prejudice" argument.

We afford the district court great deference when it comes to the admissibility of evidence for good reason. Unlike the district court, we are not in a position to observe the trial proceedings first-hand and gauge the impact of the evidence in the context of the proceedings as a whole. *United States v. Boone*, 628 F.3d 927, 932 (7th Cir. 2010). Instead, we must rely on the record on appeal. Neither of the parties' briefs nor the record indicate where on Boswell's neck the tattoo was located, how big it was, how identifiable it was, where the jury sits in the particular Indiana district court relative to the witness stand or the defense table, etc. At oral argument, the government did indicate that Boswell was wearing an open-collar shirt at trial, but counsel could not say with any certainty whether some or all of the jurors could identify the firearm tattoo from the jury box. At any rate, the admissibility of the

fact that the tattoo existed under the circumstances of this case was not error, clear or otherwise.

Furthermore, at trial, the government presented a collection of recorded conversations made incident to the January 26, 2011, sting operation. Government witnesses White, O'Boyle, and Murphy each identified Boswell's voice as that of the "male seller" in the recorded conversations. The only evidence that called these voice identifications into question was the testimony of Boswell himself, who, unsurprisingly, denied that it was his voice on the recordings. Most significantly, however, the audio recordings were played in open court. Accordingly, the jury, who heard Boswell testify, was able to make its own determination as to whether it was Boswell's voice on the recordings. Plainly stated, this determination was all but outcome determinative in this case. Indeed, defense counsel acknowledged this much in closing argument, telling the jury, "If you think that you can … say that beyond a reasonable doubt that the person you heard testify this morning (referring to Boswell) is the person that's on those recordings, then your verdict will be guilty." By finding Boswell guilty, we think the jury made their view clear. Because the audio recordings made incident to the sting operation comprise overwhelming, untainted evidence of Boswell's guilt, his challenge to his conviction must fail.

## B. Boswell's Sentence under the ACCA

As this Court has recognized, it is hard to overstate the consequences that flow from Boswell's status as an armed career criminal. Although an ordinary felon found in possession of a firearm is subject to a term of imprisonment not to

exceed ten years, 18 U.S.C. § 924(a)(2), an armed career criminal charged with possession of a firearm faces a mandatory minimum sentence of fifteen years and a maximum of life. 18 U.S.C. § 924(e)(1).

Subject to this comparatively harsh punishment, Boswell now challenges his sentence on appeal, arguing that the three qualifying felony predicates used to sentence him under the ACCA had to be alleged in the indictment and proven beyond a reasonable doubt to the jury. These failures, he claims, violated his Fifth Amendment right to due process and Sixth Amendment right to trial by jury, respectively. Boswell concedes, however, that this argument is foreclosed by *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), *see, e.g.*, *United States v. Long*, 748 F.3d 322, 328–29 (7th Cir. 2014), *cert. denied sub nom. Coprich v. United States*, — U.S. —, 134 S. Ct. 2832 (U.S. 2014), and he raises the argument merely to preserve his right to seek review by the Supreme Court. In *Almendarez-Torres*, the Supreme Court held that recidivism used to enhance a defendant's maximum penalty is not an element of the crime that must be charged in the indictment and proven to a jury beyond a reasonable doubt, but is instead a traditional sentencing factor decided by the judge. 523 U.S. at 239, 243–44. Because *Almendarez-Torres* remains the law of the land, we will continue to apply its holding until the Supreme Court tells us otherwise. Accordingly, we decline to set aside Boswell's sentence.

### III. CONCLUSION

For these reasons, Boswell's conviction and sentence are AFFIRMED.