In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 13-3283 & 13-3537

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MATTHEW GIOVENCO and
GUY POTTER,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CR 316 — **Rebecca R. Pallmeyer**, *Judge.*

ARGUED SEPTEMBER 11, 2014 — DECIDED DECEMBER 9, 2014

Before BAUER, MANION, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* Matthew Giovenco and Guy Potter (collectively "Appellants") were charged, tried, and convicted on six counts of mail fraud in violation of 18 U.S.C. § 1341. Following his conviction, Giovenco filed a renewed motion for acquittal, which the district court denied. Thereafter, both Giovenco and Potter were sentenced. On appeal, Giovenco asserts that the district court erred in denying his motion for

acquittal as he was no longer part of the mail fraud scheme at the time of the relevant mailings. Potter appeals as well, but on different grounds. Potter contends that the district court erroneously enhanced his offense level at sentencing because the victim did not suffer a loss. For the reasons that follow, we affirm the district court's rulings as to both Appellants.

## I. BACKGROUND

Since 1990, the City of Chicago has operated The Minority and Women-owned Procurement Program designed to give an advantage to businesses owned by minorities ("MBEs") in the award of city contract money. The City promotes the use of MBEs by requiring companies contracting with the City to expend certain amounts of money hiring or subcontracting with MBEs. To gain MBE status, a local business must be at least 51 percent owned by one or more members of a minority group, and its management and daily operations must be controlled by those minority-group members. Businesses wishing to qualify must submit documentation to the City supporting the minority-ownership requirements. If the City is satisfied that a business qualifies, it submits an official certification letter and includes the business on an online directory identifying MBEs.

RCN Telecom Services of Illinois, LLC ("RCN"), a cable provider, participates in the MBE program through its franchise agreement with the City. Pursuant to its agreement, RCN is required to exercise its best efforts to ensure that qualified MBEs receive 40 percent of RCN's expenditures for goods and services. To satisfy its requirement, RCN seeks out MBE subcontractors offering cable installation services using the

City's online directory. It was through this directory that RCN found Appellants' cable company in 2003.

Starting in April 2003, and continuing into 2006, Appellants participated in a scheme to defraud RCN, in which they held out their cable installation business, ICS Cable, Inc., ("ICS") as a legitimate MBE. As a purported MBE, ICS was eligible to provide cable services in return for the expenditures contractually reserved for MBEs. ICS, however, was a fraud. Appellants, along with other co-schemers at ICS, used false documentation to obtain MBE certification. They also hired a black front-man, Jerone Brown, to pose as ICS's president, when in reality he had no managerial responsibilities; Appellants, white men, actually controlled ICS. Appellants maintained this scheme for three years, throughout which RCN was ICS's only client and sole source of income. In total, RCN paid ICS $8,303,562 for the annual subcontracts earned as an apparent MBE. The profits of these fraudulently obtained contracts were shared among Giovenco, Potter, Brown, and another co-schemer, Cheronne Mayes.

The scheme continued into 2006 when Giovenco signed that year's subcontract agreement with RCN on behalf of ICS. Shortly thereafter, Giovenco was fired from ICS because the senior vice president of RCN found it difficult to work with Giovenco, and ICS did not want to risk losing its subcontract with RCN. According to Giovenco, however, he was fired because Potter suspected him of stealing business from ICS. Whatever the reason for his termination, Giovenco continued to receive checks generated by the scheme after he was fired, receiving at least two in February 2006 and one in April 2006. Potter and the remaining members of ICS continued the

scheme until August 2006, when the City began investigating ICS's MBE status. At that point, the members dissolved ICS in an apparent effort to avoid detection.

As a result of the City's investigation, Appellants were indicted charging six counts of mail fraud relating to their scheme under 18 U.S.C. § 1341. Each of the six mailings charged in the indictment occurred between May 1, 2006, and October 4, 2006, after Giovenco had been fired from ICS. The mailings were checks sent from RCN to Potter's residence pursuant to the 2006 subcontract agreement signed by Giovenco. At trial, the government presented evidence that both Giovenco and Potter intentionally defrauded RCN and created ICS as an MBE for the sole purpose of being awarded RCN contracts.

The day before closing arguments, Giovenco moved for judgment of acquittal. He argued that he was entitled to the judgment because he was no longer part of the scheme when the charged mailings took place. He also argued that acquittal was appropriate because RCN suffered no tangible loss as a result of the scheme. The government disagreed, arguing that withdrawal is not a defense to mail fraud and that it was not required to prove a loss. The district court did not rule on Giovenco's motion at that time and the case went to the jury. The jury found Giovenco guilty on all six counts. Giovenco filed a renewed motion for judgment of acquittal following the verdict, raising only the withdrawal argument. The district court denied both motions before sentencing. A separate jury also found Potter guilty on all six charges.

At sentencing, the district court imposed a 16 offense level increase on each Appellant's sentence according to United States Sentencing Guidelines § 2B1.1 and based on RCN's loss. Potter was sentenced to 54 months' imprisonment, and Giovenco was sentenced to 36 months' imprisonment.

Giovenco now appeals the district court's denial of his motions to acquit, arguing that because he no longer worked for ICS at the time of the six mailings underlying the mail fraud charges, he cannot be held legally accountable for the scheme. Potter also appeals, but he does not challenge his conviction. Instead, Potter argues that the district court improperly imposed the 16 offense level increase because RCN did not actually suffer a loss. Because Appellants appeal on separate grounds, we will consider their arguments individually, beginning with Giovenco.

## II.  DISCUSSION

### A.  Giovenco's Conviction

We review a district court's denial of a motion for judgment of acquittal *de novo* in the light most favorable to the prosecution. *United States v. Seidling*, 737 F.3d 1155, 1159–60 (7th Cir. 2013). If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must uphold the jury's conviction. *Id*. A mail fraud conviction requires three elements: (1) a scheme or artifice to defraud, (2) the use of the mailing system for the purpose of executing the scheme, and (3) the defendant's participation in the scheme with the intent to defraud. 18 U.S.C. § 1341; *Seidling*, 737 F.3d at 1160.

Giovenco's challenge centers on the third element. He argues that because he was fired before the six charged mailings were sent, he cannot be considered a participant in the scheme. Essentially, Giovenco claims he withdrew from the scheme, precluding conviction. Withdrawal, however, is not a recognized defense to mail fraud. *United States v. Read*, 658 F.2d 1225 (7th Cir. 1981). This is because unlike conspiracy where withdrawal is an available defense, no agreement is necessary for mail fraud liability. *Id*. at 1240. *See also United States v. Adeniji*, 221 F.3d 1020, 1026 (7th Cir. 2000) ("The joint agreement that is essential to a defendant's liability for the crime of conspiracy is not a prerequisite to a conviction for mail fraud."). While conspiracy punishes membership in an agreement to commit illegal activity, mail fraud punishes the act of using the mail system to further a scheme to defraud. *Read*, 658 F.2d at 1240. Therefore, "[a] party's 'withdrawal' from a scheme is … no defense to the crime because membership in the scheme is not an element of the offense." *Id*. Instead, association and participation in the criminal venture are sufficient for liability. *Id*. *See also Adeniji*, 221 F.3d at 1026 (concluding adequate evidence of "knowing participation in the … scheme" was sufficient to support a mail fraud conviction).

This fundamental distinction between conspiracy and mail fraud is also consistent with the longstanding rule that a mail fraud conviction does not require proof that a defendant personally mailed the letters at issue. *United States v. Daniel*, 749 F.3d 608, 615 (7th Cir. 2014); *see also United States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995) (stating that the government need only prove that a scheme existed in which use of mails

was reasonably foreseeable). All that is required is that "the use of the United States mail system was reasonably foreseeable to [the defendant] and that an actual mailing occurred in furtherance of the scheme." *Daniel*, 749 F.3d at 615.

The undisputed facts presented at trial show Giovenco's participation in the mail fraud scheme. The government presented testimony that Giovenco admitted to investigators that he and Potter founded ICS as an MBE for the purpose of obtaining contracts from RCN. He also stated he knew ICS received its payments from RCN in the form of checks mailed to Potter's residence. Although Giovenco no longer worked for ICS at the time of the charged mailings, it was reasonably foreseeable that the mailings would continue to occur as a result of his prior participation. In fact, the relevant mailings were caused by Giovenco—he signed the very contract that obligated RCN to send the checks in issue. Based on these facts alone, Giovenco's conduct satisfies the participation with intent to defraud element of mail fraud.

As to the remaining elements, the record contains ample evidence in support of both the existence of a scheme and the use of the mailing system to execute the scheme, neither of which Giovenco challenges. Because a rational trier of fact could have found all three essential elements of mail fraud beyond a reasonable doubt, Giovenco's conviction must stand.

### B. Potter's Offense Level Enhancement

By contrast, Potter does not challenge his conviction, but his sentence. Pursuant to Application Note 3(F)(v) of United States Sentencing Guidelines § 2B1.1, the district court determined that the amount of loss was $8.3 million. Based on that loss

amount, the district court found that a 22 offense level increase[1] was warranted, but departed downward and imposed a 16 offense level increase instead. Potter argues that the 16 offense level increase should not have been applied to his sentence because RCN did not actually suffer a loss. Accordingly, he asks the court to remand this matter for a new sentencing hearing.

We review the district court's interpretation and application of the Guidelines *de novo*. *United States v. Natour*, 700 F.3d 962, 975 (7th Cir. 2012). We also review *de novo* whether the facts as found are sufficient to support an enhancement under the Guidelines. *Id*. at 974. As stated above, the district court applied § 2B1.1 of the Guidelines for Potter's sentence, which provides the base offense level for defendants convicted of mail fraud and includes various offense level increases depending on the amount of loss at issue. United States Sentencing Commission Guidelines Manual § 2B1.1 (2013). None of the parties dispute that RCN spent $8.3 million on expenditures with ICS. However, Potter challenges whether that $8.3 million can truly be characterized as a loss. In his view, because RCN still received its contracted cable services from ICS, it is of no consequence for a loss calculation that ICS was a false MBE.

As the district court noted during Potter's sentencing hearing, Application Note 3(F)(v) of § 2B1.1 appears to contemplate the scheme here. Application Note 3(F)(v)

---

[1] As a point of clarification, the district court applied a 22 offense level increase, but the proper offense level increase for an $8.3 million loss is actually 20 based on § 2B1.1(b)(1)(K) of the Sentencing Guidelines.

provides that where regulatory approval by a government agency is obtained by fraud, the "loss shall include the amount paid for the property, services, or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services." United States Sentencing Commission Guidelines Manual § 2B1.1 cmt. n.3(F)(v) (2013). It is undisputed that ICS obtained MBE certification from the City of Chicago through fraud, putting Potter's conduct squarely within the scheme considered by Application Note 3(F)(v). It is also undisputed that RCN paid $8.3 million for ICS's services. Taken together, RCN's $8.3 million expenditure is within the ambit of Application Note 3(F)(v).

Thus, because Application Note 3(F)(v) applies in this situation, the district court correctly calculated loss consistent with its terms. Applying Application Note 3(F)(v), the district court properly measured RCN's loss as its total expenditures to ICS without credit for the value of ICS's services, and was within its discretion to depart downward from the Guidelines and impose a 16 offense level increase instead of the applicable 20 offense level increase. *See United States v. Lane*, 323 F.3d 568, 588 (7th Cir. 2003) ("Once the amount of loss is calculated under the guidelines, the court has the discretion to modify the amount of loss to more accurately reflect the economic realities of the crime."). In sum, the facts as found in the record support the district court's 16 offense level increase.

To that end, it is worth noting that the alternative measurement of loss in this case would have resulted in the same 16 offense level increase. If loss cannot be reasonably determined, the court must measure loss by the amount of gain that resulted from the scheme. United States Sentencing

Commission Guidelines Manual § 2B1.1 cmt. n.3(B) (2013). The ICS scheme generated $2.2 million in net profits, which would indicate a 16 offense level increase under the Guidelines. *Id*. at § 2B1.1(b)(I). Even under the more lenient measure, Potter still properly bears the 16 offense level increase to his sentence.

### III. CONCLUSION

We AFFIRM the district court's denial of Giovenco's motion for acquittal. We also AFFIRM the district court's offense level enhancement for Potter.