In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 18-1200 & 18-1263

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

NIKOLAY TANTCHEV and
BATMAGNAI CHOGSOM,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16-cr-174 — **Amy J. St. Eve**, *Judge.*

_____

ARGUED NOVEMBER 1, 2018 — DECIDED FEBRUARY 21, 2019

_____

Before WOOD, *Chief Judge*, and MANION and ROVNER, *Circuit Judges*.

MANION, *Circuit Judge*. After a six-day trial involving twenty-nine witnesses, a federal jury convicted Nikolay Tantchev of exporting and attempting to export stolen cars, submitting false documents to customs officials, and structuring financial transactions to avoid federal reporting requirements. That same jury acquitted Tantchev's co-defendant,

Batmagnai Chogsom, of charges related to the stolen cars and false documents, but it convicted Chogsom of making a false statement to an IRS agent. The district court sentenced Tantchev to 40 months' imprisonment and Chogsom to 3 years' probation.

Both defendants appeal their convictions. Tantchev alleges several errors by the district court at trial, and Chogsom challenges the sufficiency of the evidence against him. We affirm the convictions.

## I.

Tantchev, a native of Bulgaria, owned a trucking business that operated out of a warehouse in Chicago. Chogsom, a Mongolian immigrant, worked for Tantchev.

In 2008, Tantchev began shipping containers of goods to Bulgaria using a company called Atlantic Express. Seeing an opportunity, Tantchev started a small side-business arranging shipping containers from Atlantic Express for others. Tantchev would order containers from Atlantic Express at a discount and charge a premium for acting as a middle man. Though he had the containers delivered to his Chicago warehouse, this was a separate operation from his normal trucking business. Through Chogsom, members of Chicago's Mongolian community began coming to Tantchev to set up shipments to Mongolia. These shipments often included vehicles.

According to Tantchev, his involvement with these international shipments was minimal. A customer looking to ship something would approach Tantchev or Chogsom. Tantchev would then order a shipping container from Atlantic Express, which would drop it off at Tantchev's warehouse. The customer would come to the warehouse and load the container

himself, and the container would be sealed. Atlantic Express would then pick up the loaded container from the warehouse. Tantchev would fill out the appropriate papers based on what his customers told him and send the papers and any other documents to Atlantic Express to forward to United States Customs and Border Protection (CBP).

In the early part of 2011, CBP discovered three of Tantchev's shipments to Mongolia contained stolen cars.[1] Additionally, the documentation Tantchev had submitted did not accurately reflect the contents of the containers. One container was supposed to hold a Honda, but instead contained a stolen BMW. Two others were declared as containing mining machinery, but they actually contained a stolen Mercedes and two stolen Lexuses.

Also in early 2011, Tantchev began making large deposits into seven bank accounts at Fifth Third Bank and Chase Bank. Two of the accounts were in Tantchev's name, one belonged to his father, and the other four were in the names of Kosa Bonev, Otgonbayar Jigmidsambuu, Jianmei Li, and Yu Li, respectively. No single deposit was ever over $10,000, the maximum amount that does not trigger a federal reporting requirement. Despite no single deposit ever breaching that $10,000 ceiling—which Tantchev knew to be the reporting threshold—Tantchev managed to deposit $574,965 into those accounts in less than two months, from March 14 to May 4, 2011. Then, despite the fact that some of the account holders

---

[1] The parties do not dispute that the cars were stolen. All four cars charged in the indictment were subject to liens. When authorities reported to the creditors that the cars had been discovered on shipping containers bound for Mongolia, the creditors reported them stolen and recovered them.

were not even in the United States at the time, from March 16 to May 5, 2011, wire transfers were sent from the accounts of Bonev, Jigmidsambuu, Jianmei Li, and Yu Li in the total amount of $552,090 to twenty-two different accounts located in Sofia, Bulgaria.[2] This activity prompted Fifth Third Bank to report Tantchev for suspected criminal activity.

The IRS began an investigation after receiving the report from Fifth Third Bank. As part of that investigation, Agent Jason Gibson set out to find Jianmei Li, the listed owner of one of the Fifth Third bank accounts. Through the Illinois Secretary of State, Agent Gibson acquired the information and a photo from an Illinois identification card in that name. After the address on the ID proved to be a bust, he and another agent went to the address connected with the bank account. At that address, he spoke with Gerelt Dashdorj, the nephew of defendant Chogsom. After talking with Dashdorj and showing him the picture from the ID, Agent Gibson believed Jianmei Li was Burmaa Chogsom, defendant Chogsom's sister.

Agent Gibson then went to interview defendant Chogsom. He showed Chogsom the photo from the Illinois ID and asked

---

[2] From whom all this money came and whether they are trying to get it back are among the hollow spots in this case—questions the facts raise in questioning minds but the parties do not litigate or answer. The government presented evidence at trial suggesting Tantchev received $750,000 in wire transfers from Mongolia (including several transfers labeled "for car"), but it did not have direct evidence that was the source of the full $574,965. Neither is there any discussion in the briefs about whether these Mongolian buyers were unwittingly purchasing stolen cars or were themselves part of the criminal scheme. While these questions are ultimately immaterial because the facts we have are enough to resolve this appeal, there is doubtless more to the story.

him if he recognized the woman. Chogsom replied it was "Jianmei Li," a woman with whom he used to work. Agent Gibson asked Chogsom if he had a sister named Burmaa. Chogsom answered he did, and that she was in Mongolia. Agent Gibson never asked if the woman in the photo was Chogsom's sister Burmaa.

As it turns out, the woman in the photo was indeed Burmaa Chogsom. She had acquired the Illinois ID in the name of Jianmei Li using a fraudulent Chinese passport and a Social Security number originally issued to a worker in Saipan. She had returned to Mongolia in 2010.

A federal grand jury issued an indictment against Tantchev and Chogsom on March 16, 2016. The indictment charged Tantchev with three counts of exporting and attempting to export stolen vehicles, two counts of submitting false writings to CBP, and one count of structuring deposits to avoid federal reporting requirements. The indictment charged Chogsom with two counts relating to the export of stolen vehicles, one count of submitting false writings, and one count of lying to an IRS agent based on his identifying the woman in the photo as Jianmei Li rather than as Burmaa Chogsom.

The case proceeded to a jury trial. The jury heard testimony from twenty-seven witnesses for the government and from both defendants. The jury convicted Tantchev of all charges leveled against him. It convicted Chogsom of lying to the IRS agents and acquitted him of the remaining charges. Both defendants made post-trial motions for judgment of acquittal, and Tantchev moved for a new trial. The district court denied all three motions. The defendants appeal.

**II.**

Tantchev appeals the denial of his motion for a new trial, alleging multiple errors. Chogsom appeals the denial of his motion for judgment of acquittal. As these two defendants present discrete issues, we will address them separately.

**A.**

We begin with Chogsom's appeal of the denial of his motion for judgment of acquittal. "We review a district court's denial of a motion for judgment of acquittal *de novo* in the light most favorable to the prosecution." *United States v. Giovenco*, 773 F.3d 866, 869 (7th Cir. 2014). We will affirm "[i]f any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* It is the defendant's task to convince us of the insufficiency of the evidence, a burden we have called "heavy, indeed, nearly insurmountable." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010).

The indictment charged Chogsom with violating 18 U.S.C. § 1001(a)(2), which makes it a crime to "knowingly and willfully [make] a materially false statement in connection with a matter within the jurisdiction of a federal agency." *United States v. Rahman*, 805 F.3d 822, 836 (7th Cir. 2015). The indictment read: "[I]n response to the agents' question as to whether CHOGSOM recognized the woman in the photo they displayed, CHOGSOM responded that the person depicted in the photo was 'Jianmei Li'… ."[3]

---

[3] The jury instructions described the charge as follows: "Chogsom is charged … with knowingly and willfully making a false statement when he was interviewed by agents of the [IRS] … about whether he recognized and knew the name of a woman depicted in a photo the agents displayed to him… ."

Chogsom admits to identifying the woman as Jianmei Li. He admits he knew the woman in the photo was his sister Burmaa. He even admits he gave the name "Jianmei Li" because he wanted to protect his sister from immigration problems. Nevertheless, Chogsom argues the jury should not have convicted him because his answer was not literally false. Chogsom maintains his sister was using the name Jianmei Li in the United States. It was her American alias, like a "street name." Because Burmaa was using the name Jianmei Li in the United States, Chogsom maintains his answer that the woman in the photo was Jianmei Li was literally true, and thus he did not "make a false statement" in violation of the statute.

A statement that is literally true cannot support a conviction under § 1001(a)(2), "even if a defendant gives a misleading or nonresponsive answer." *Rahman*, 805 F.3d at 838. For example, in *Bronston v. United States*, 409 U.S. 352 (1973),[4] the government charged Samuel Bronston with committing perjury at a bankruptcy hearing. An attorney for a creditor asked Bronston, the president of the bankrupt company, if Bronston had ever had an account at a Swiss bank. Bronston answered, "The company had an account there for about six months, in Zurich." He did not mention his former personal account at the International Credit Bank in Geneva. However, it was undisputed that his statement concerning the company's account was true. *Id.* at 353–54.

---

[4] *Bronston* and *United States v. Gorman*, 613 F.3d 711 (7th Cir. 2010), which we discuss below, both address prosecutions under federal perjury statutes, not § 1001(a). But we have applied the reasoning of those cases in the § 1001 context. *Rahman*, 805 F.3d at 838 (citing both *Gorman* and *Bronston* in addressing the appeal of a conviction under 18 U.S.C. § 1001).

And that made all the difference to the Supreme Court, which overturned Bronston's conviction under the perjury statute. *Id.* at 362. Though his answer gave "an implication … that there was never a personal bank account … [t]he [perjury] statute does not make it a criminal act for a witness to willfully state any material matter that *implies* any material matter that he does not believe to be true." *Id.* at 357–58. The Court stated, "The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360. If the questioner was not satisfied with Bronston's non-responsive answer, he should have pressed the issue with his questions. *Id.* at 362.

So sometimes, by cleverness and quick thinking, a defendant can avoid directly answering a tough question without exposing himself to conviction for doing so. But sometimes not. In *United States v. Gorman*, 613 F.3d 711 (7th Cir. 2010), Jamarkus Gorman was called to testify before a grand jury. One of the grand jurors asked him, "Mr. Gorman, did you have a Bentley in your garage at [your condominium complex]?" Gorman replied, "No." Only, there had been a Bentley in the garage. The vehicle belonged to Gorman's cousin, but Gorman had given a condominium employee the impression it belonged to him and eventually orchestrated its removal from the garage so he could steal its contents. Gorman was charged with and convicted of perjury based on his answer to the grand jury. *Id.* at 714–17.

Appealing his perjury conviction, Gorman "argue[d] he could not have perjured himself because he did not 'have' a Bentley"; it was his cousin's. Gorman argued "have" requires ownership, not just possession. *Id.* at 715–16

We acknowledged that Gorman's argument, "[w]hen stretched to its logical limit," had "some merit." *Id.* at 716. After all, "have" has many meanings. *Id.* (citing *Webster's Third New International Dictionary* 1039 (Philip Babcock Gove ed., 3d ed. 1986)). "But what [Gorman] ignore[d] is that our precedent dictates that even when a question or answer is ambiguous, a conviction may still be upheld if a jury has been called upon 'to determine that the question *as the defendant understood it* was falsely answered… .'" *Id.* (last alteration in original) (quoting *United States v. Scop*, 940 F.2d 1004, 1012 (7th Cir. 1991)). We concluded the jury at Gorman's perjury trial was well within its rights to find Gorman understood the grand juror's question as inquiring about possession, rather than ownership, so his answer to the question *as asked* was knowingly false. *Id.*

The instant case is much more similar to *Gorman* than *Bronston*. Here, the IRS agents asked Chogsom to identify the woman in the photo from the Illinois ID. He knew it was his sister Burmaa, but he told them "Jianmei Li."

Chogsom, like Gorman, argues he gave an acceptable answer to an ambiguous question. And, as in *Gorman*, that argument has some validity. "Who is this?" or "Do you know who this is?" are undoubtedly ambiguous questions. And Jianmei Li was certainly *an* identity for the woman named Burmaa Chogsom—the government's own evidence shows she had an ID with "Jianmei Li" on it. Nevertheless, the jury was entitled to resolve that ambiguity against Chogsom and conclude he understood the IRS agents wanted to know Burmaa's "actual" name, not the alias she acquired with a fake Chinese passport. Understood that way, Chogsom's decision to give her alias was not just misleading, as was the case in *Bronston*,

but false, as in *Gorman*. Accordingly, we cannot say it was un-reasonable for the jury to conclude Chogsom gave a false answer to the IRS agents' ambiguous question.

**B.**

We turn now to Tantchev, who alleges four errors he be-lieves entitle him to a new trial. We take them in turn, noting that we will reverse the district court's decision to deny his motion for a new trial only if we find an abuse of discretion. *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012).

**1.**

Tantchev first contends the district court should not have given a deliberate avoidance or "ostrich" instruction. Before getting into the analysis, some additional background is help-ful. The government charged Tantchev with exporting and at-tempting to export stolen vehicles and submitting false writ-ten statements to CBP. Both crimes require that the defendant acted with knowledge. *See* 18 U.S.C. § 553(a) ("Whoever knowingly imports, exports or attempts to import or export—(1) any motor vehicle…knowing the same to have been sto-len… ."); 18 U.S.C. § 1001(a) ("[W]hoever … knowingly and willfully…(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry … ."). In defense, Tantchev contested only the knowledge element of the offenses. He maintained he did not *know* he was exporting stolen cars and submitting false information to CBP.

The government requested the court give an ostrich in-struction, which is meant "to inform the jury that a person may not escape criminal liability by pleading ignorance if he knows or strongly suspects he is involved in criminal dealings

but deliberately avoids learning more exact information about the nature or extent of those dealings." *United States v. Green*, 648 F.3d 569, 582 (7th Cir. 2011) (internal quotation marks omitted) (quoting *United States v. Carani*, 492 F.3d 867, 873 (7th Cir. 2007)). Tantchev opposed the instruction, arguing the government had not presented sufficient evidence of deliberate avoidance to justify it. The district court agreed with the government and gave the instruction.

In its order addressing Tantchev's post-trial motion for new trial, the district court stated its conclusion that Tantchev had "cut off his normal curiosity" by never looking into the containers shipped from his warehouse. Specifically, "Tantchev deliberately avoided exhibiting normal curiosity and safety and liability-related caution as to the contents of the shipping containers in his truck yard, especially for someone with years of experience in the transportation industry." In this appeal, Tantchev continues to argue the government did not present sufficient evidence to support the instruction.

"We review a district court's decision to give an ostrich instruction for abuse of discretion, and in doing so we view the evidence in the light most favorable to the government." *United States v. Pierotti*, 777 F.3d 917, 920 (7th Cir. 2015). "An ostrich instruction is appropriate where (1) a defendant claims to lack guilty knowledge … and (2) the government presents evidence from which a jury could conclude that the defendant deliberately avoided the truth." *United States v. Garcia*, 580 F.3d 528, 537 (7th Cir. 2009). Evidence of deliberate avoidance "can be placed into two general categories: evidence of 'overt physical acts,' and evidence of 'purely psychological avoidance, a cutting off of one's normal curiosity by an effort of will.'" *United States v. Carrillo*, 435 F.3d 767, 780

(7th Cir. 2006) (quoting *United States v. Craig*, 178 F.3d 891, 896 (7th Cir. 1999)).

The district court concluded Tantchev "cut off" his curiosity by not looking in the containers, alluding to the language of psychological avoidance. We have found psychological avoidance where a defendant was faced with proverbial "red flags" but did not investigate. *See United States v. Pabey*, 664 F.3d 1084, 1093 (7th Cir. 2011); *United States v. Leahy*, 464 F.3d 773, 796 (7th Cir. 2006) ("[F]ailure to ask questions that would certainly arise from the circumstances … is evidence that could lead a jury to determine [the defendant] deliberately avoided learning about the [ ] scam." (alterations in original) (quoting *Craig*, 178 F.3d at 897–98)). However, we must remember the instruction is aimed at defendants acting like fabled ostriches who bury their heads in the sand. We do not, if we may add to the metaphorical menagerie, require every defendant to act like Curious George. Accordingly, courts must be careful, lest we obliterate the already thin line between avoidance, which is criminal, and indifference, which "cannot be punished." *See Leahy*, 464 F.3d at 796. We must keep in mind that "evidence merely supporting a finding of negligence—that a reasonable person would have been strongly suspicious, or that a defendant should have been aware of criminal knowledge—does not support an inference that a particular defendant was deliberately ignorant." *Carrillo*, 435 F.3d at 782. The necessary willful blindness must surpass recklessness as well. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).

Here, the evidence is very close. Tantchev argues he was never present for the loading of the containers to Mongolia

and he filled out the CBP forms with information his customers provided. He testified he did not want to look in the containers because he did not want liability for damaged goods. He believed if he did not open the containers, any liability for damages would fall on the customers who loaded them. But he testified that he was very safety conscious in his trucking business and took great precautions to ensure his shipments were safe. He testified this was because the liability in his trucking business would fall on him, not on his customers.

The government argues it strains credulity to believe that a man who owns his own transportation company would allow complete strangers to load shipping containers to be sent, in his name, to a foreign land without checking and making sure everything is safely stowed. Tantchev asserts that argument necessarily leads to the conclusion he had actual knowledge—it assumes he looked in the containers and actually knew the cars were stolen and the manifests were inaccurate. If that were true, the district court would have erred by giving the ostrich instruction because evidence pointing solely to direct knowledge of criminal activity does not support the instruction. *See United States v. Tanner*, 628 F.3d 890, 905 (7th Cir. 2010); *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990) ("[W]hen the facts require the jury to make a 'binary choice' between 'actual knowledge' and 'complete innocence,' the ostrich instruction should not be given."). The government certainly pushed an "actual knowledge" narrative, but the evidence does not present only a "binary choice" between actual knowledge or no knowledge. Instead, it can support a finding of both actual knowledge and deliberate avoidance. *See United States v. Carrillo*, 269 F.3d 761, 769 (7th Cir. 2001).

For instance, the jury could have found Tantchev looked in the containers and saw the contents did not match the information on the forms he would send to Atlantic Express for CBP. That would amount to actual knowledge the forms contained false information. But the jury could consider that knowledge as a "red flag" sufficient to raise questions in Tantchev's mind that everything was not above-board. It was then Tantchev's deliberate avoidance that led to his not having actual knowledge the cars were stolen.

Alternatively, the jury could have believed Tantchev's testimony that he never looked in the containers or verified the information provided by his customers, but concluded he adopted that indifferent attitude out of a desire to avoid confirming that he was part of a criminal scheme. After all, he testified that he was safety-conscious in his trucking business. The jury was entitled to conclude Tantchev purposely did not subject these containers to the scrutiny he exercised in the other part of his business and draw a negative inference from that change in behavior.

These are not the strongest examples of when an ostrich instruction is appropriate, but we are reviewing the court's decision to give the instruction for an abuse of discretion, taking all inferences in the light most favorable to the government. In a close case like this one, that standard is dispositive. *See United States v. Ramirez*, 574 F.3d 869, 881 (7th Cir. 2009) ("[I]n cases such as this, we should defer to the district court's exercise of discretion to give the ostrich instruction."). While a different court may not have given the ostrich instruction under these circumstances, the district court in this case did not abuse its discretion in doing so.

**2.**

Tantchev's second allegation of error also attacks a knowledge instruction. The district court instructed the jury: "If you find that the defendant was in possession of property that recently had been stolen, you may infer that he knew it was stolen." The instruction tracked our suggested pattern. *See* Seventh Circuit Pattern Criminal Jury Instruction 4.14. Courts have given this instruction, or one like it, "[f]or centuries." *See Barnes v. United States*, 412 U.S. 837, 843–44 (1973).

Tantchev argues the evidence did not support this instruction. He maintains he had a legitimate reason to possess the cars: he was shipping them for customers. He also notes these cars were not "stolen" in the usual sense; that is, they were not hot-wired from a parking deck in the Loop or carjacked. But Tantchev does not dispute the cars at issue in this case were all nevertheless "stolen." *See generally United States v. Turley*, 352 U.S. 407, 417 (1957) ("'Stolen' as used in 18 U.S.C. § 2312 includes all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny."). And arguments about why Tantchev possessed them or when they were stolen are questions for the jury. *See United States v. Riso*, 405 F.2d 134, 138 (7th Cir. 1968) ("[W]hether possession is sufficiently recent … is a question of fact solely for the jury.").

Tantchev was in possession of stolen property. It was up to the jury to decide whether the surrounding circumstances supported the inference of knowledge. It was not reversible error to give the instruction.

**3.**

Tantchev's third allegation of error concerns the district court's decision to allow the government to pursue a line of questioning during his cross-examination. We review such evidentiary decisions "for abuse of discretion." *United States v. Boswell*, 772 F.3d 469, 475 (7th Cir. 2014).

During Tantchev's direct examination, he and his counsel had the following exchange:

> Q. And other than the three [containers named in the indictment], were there any problems with any of the rest of your containers—
>
> A. No problem.
>
> Q. —that were inspected?
>
> A. No problem.

On cross-examination the next day, the government sought to introduce evidence there were indeed other containers that "had problems," specifically that there were two other shipments that also contained stolen cars.[5]

> Q. … And you told us yesterday, sir, that besides these three shipments, there were never any other problems, right?
>
> A. Yes, sir.
>
> Q. Well, that's not true is it?

At this point, defense counsel objected, arguing that was not an accurate characterization of Tantchev's testimony from

---

[5] The government did not charge these shipments in the indictment.

direct. The court overruled the objection, and the questioning continued:

> Q. In fact, at exactly the same time these shipments were seized, there were two other [sic] seized also loaded up with stolen cars --
>
> MR. BRINDLEY [Defense counsel]: Objection, your Honor.
>
> BY MR. HOGAN [Prosecutor]:
>
> Q. -- also from your --
>
> MR. BRINDLEY: Objection.
>
> BY MR. HOGAN:
>
> Q. -- also from your yard?
>
> THE COURT: Wait. There is an objection.

There then followed a sidebar, after which the court allowed the government to proceed with the questioning, but in a limited manner. The court allowed the government to contradict Tantchev's testimony but prohibited it from getting into the substance of the "problems" with the containers. Nonetheless, as cross-examination continued, the prosecutor mentioned "stolen cars" two more times. Both times, defense counsel objected and the court intervened before Tantchev answered the question. Tantchev objects to this exchange.

"It is well-settled that 'when a criminal defendant elects to testify in his own defense, he puts his credibility in issue and exposes himself to cross-examination, including the possibility that his testimony will be impeached.'" *United States v.*

*Kohli*, 847 F.3d 483, 492 (7th Cir. 2017) (quoting *Boswell*, 772 at 475). Tantchev argues the government's questioning was improper because it did not contradict his earlier testimony from his direct examination.

The government and the district court both interpreted Tantchev's testimony to be that he never had any other problems with shipments. Tantchev maintains he did not testify that he *never* had any other problems with his shipments, but only that he had no problems with his shipments that were outstanding at the time CBP caught the containers charged in the indictment.

We conclude both are reasonable interpretations of Tantchev's answer from his direct testimony, which, particularly given that Tantchev did not let his attorney finish the question before answering, is ambiguous. That conclusion resolves the issue. Presented with two possible interpretations, we will not say the district court abused its discretion by choosing one over the other.

**4.**

Tantchev's final allegation of error concerns the prosecutor's comments during closing arguments. During the trial, evidence came in relating to the operations of the Fifth Third Bank location from which the wire transfers were sent to Bulgaria. Namely, it was introduced that an account holder had to be physically present in the branch to send a wire transfer,

and it was the responsibility of two employees, the branch manager and the "banker,"[6] to enforce this policy.

In the course of questioning one of the bank employees, the government elicited testimony that the banker at a particular branch Tantchev had used during the relevant period had been fired. However, because of objections from the defense, the government was not able to introduce the witness's testimony concerning the firing of that branch's manager or *why* those employees were fired.

Nevertheless, in his closing argument, the prosecutor said, "But you heard from Ms. Sanchez that her supervisors back at that time at Fifth Third Bank were both fired for malfeasance." This prompted an objection from defense counsel, who remarked that the reason the supervisors were fired had been "stricken as hearsay." The district court then gave the jury the following admonition: "Ladies and gentlemen, if I struck something from the record, I will tell you now and tell you, again, when I instruct you that you should not consider it at all. You should disregard it." In the final instructions to the jury before it began deliberations, the court also instructed that statements by attorneys are not evidence.

Tantchev argues the prosecutor's misstatement of the evidence prejudiced him to the point of requiring a new trial. Our analysis proceeds in two phases: "[W]e first look at the disputed remarks in isolation to determine if they are proper. If they are improper, we then consider the remarks in light of the entire record to determine if the defendant was deprived

---

[6] A witness testified the banker "sits at the desk greeting customers, taking care of them for opening a checking account, savings account, CDs, auto loans."

of a fair trial." *United States v. Cotnam*, 88 F.3d 487, 498 (7th Cir. 1996). Here, the statement is clearly improper: the prosecutor referenced facts not in evidence. So, we must ask whether that impropriety deprived Tantchev of a fair trial.

We consider six factors: "(1) whether the prosecutor misstated evidence; (2) whether the statements implicate a specific right of the defendant; (3) whether the defense invited the prosecutor's remarks; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut." *United States v. Richards*, 719 F.3d 746, 766 (7th Cir. 2013). The fifth factor is "[t]he most important," because "[s]trong evidence of guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *Rodriguez v. Peters*, 63 F.3d 546, 558 (7th Cir. 1995) (quoting *United States v. Gonzalez*, 933 F.2d 417, 431–32 (7th Cir. 1991)).

Some of these factors do lean in favor of Tantchev. The prosecutor clearly misstated the evidence, and there is no indication Tantchev invited the remark in any way. But most factors lean against him. The statements did not implicate a specific right. The district court gave a curative instruction immediately after the prosecutor made the remark and instructed the jury before deliberations that statements by attorneys are not evidence. Tantchev had an opportunity to rebut, as his counsel made his closing argument after the prosecutor made the offending statement. Finally, and most importantly, the weight of the evidence is heavily on the side of the government. The prosecutor's comment went to the structuring charge, the implication being Tantchev was able to perpetrate his financial scheme with the help of corrupt bank employees. That conclusion was not critical to the case. The government

presented evidence of nearly 100 separate deposits totaling almost $575,000, all close in time, yet no single deposit was ever more than $10,000. These deposits were then quickly followed by large wire transfers to bank accounts in Bulgaria, Tantchev's native country. And the government showed some of the named account holders were not even in the United States at the time. In the face of all this evidence, it is not as if the bank employee's bad acts were the key evidence Tantchev was making his deposits with the intent to avoid the reporting requirements. The prosecutor's comment was improper, but it did not deprive Tantchev of a fair trial.

### III.

This case contains several close calls, and Chogsom and Tantchev raise compelling points. But our review requires deference to the district court and the jury, both of which have seen the witnesses and heard the testimony, and thus have a greater appreciation of what transpired during those six days in March 2017. With that deference in mind, and for the reasons set forth above, we AFFIRM.