*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
October 22, 2020

Plaintiff-Appellee,

v

No. 345748
Genesee Circuit Court
LC No. 16-039732-FC

FRANK JAMES NEAL,

Defendant-Appellant.

ON RECONSIDERATION

Before: CAVANAGH, P.J., and BECKERING and GLEICHER, JJ.

PER CURIAM.

A jury convicted defendant of four counts of assault with intent to murder (AWIM), MCL 750.83, and four counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b, based on a gunfight at his home. On April 16, 2020, we issued an opinion vacating defendant's convictions and sentences and remanding for a new trial based on the prosecutor's purported misconduct at trial. As defendant's prosecutorial misconduct challenges were dispositive, we did not consider defendant's other appellate challenges. See *People v Neal*, unpublished per curiam opinion of the Court of Appeals, issued April 16, 2020 (Docket No. 345748) (*Neal I*).

Defendant sought reconsideration of our opinion. Although established and prejudicial prosecutorial misconduct warrant a new trial, a successful challenge to the sufficiency of the evidence demands reversal of a defendant's convictions. Accordingly, defendant requested that this Court consider his appellate challenge to the sufficiency of the evidence, as well as his challenge to the prosecutor's conduct. We granted defendant's motion for reconsideration and vacated our opinion in *Neal I*. *People v Neal*, unpublished order of the Court of Appeals, entered August 20, 2020 (Docket No. 345748).

We are now convinced that we erred in *Neal I* in determining that the prosecutor engaged in misconduct warranting a new trial. Further, the prosecutor presented sufficient evidence to

-1-

support defendant's four AWIM convictions and his convictions did not preponderate against the evidence. Given our resolution of these issues, we must also address the other two arguments raised by defendant in his appellate brief—that the trial court denied defendant his right to present a defense by excluding evidence of the victim's violent criminal history and that the court abused its discretion in permitting an incompetent witness to testify at trial. We discern no error and affirm.

## I. FACTUAL BACKGROUND

This case started with a verbal altercation between lovers. On the afternoon of May 23, 2016, Damontae Davis argued with his girlfriend, Shamekea Boyland, about her car keys and his cell phone. The argument took place on the porch of a home owned by Shamekea's sister, Rochelle Boyland. Defendant, Shamkea's and Rochelle's brother, was staying at the house at the time.

Defendant attempted to defuse the argument, but he and Davis wound up in a fist fight. Davis walked away from the fight and called his cousin, Brandon Smith, for a ride. Smith arrived in a car occupied by three other young men—Edris Thomas, Christopher Turner, and Anton Bruce. Davis realized that he did not have his cell phone and directed the car back to the Boyland home. Rochelle noticed the car full of men returning and dialed 911. At that time, Rochelle's nephew, Shelton Boyland, exited the house and came onto the porch. The five men from Smith's car walked toward the porch, and Davis and Shamekea promptly resumed arguing. Davis began to climb onto the porch when gunshots rang out and the men fled. Smith was shot in the back with shotgun pellets and was instantly paralyzed. Turner was wounded in the back of a knee.

Several witnesses saw a man step out from a side door of the house and start shooting. Overwhelming evidence supported that defendant was that shooter. Defendant admitted at trial that he had fired a rifle, but insisted that he aimed only toward the sky, intending to disperse the men who had gathered in front of the house. Other testimony supported that the shooter took aim in the direction of the scattering men. Three guns were found near the scene: a rifle and two shotguns. Defendant's DNA was present on the rifle and one of the shotguns. Defendant claimed that as he was shooting into the air he heard other shots being fired. Other witnesses, too, raised the specter of a second shooter. Defendant expressed his belief that the second gunman was shooting toward the Boyland home.[1] Other witnesses described the second shooter as a man standing on the porch, sporting braids and wearing a red shirt, a description consistent with Shelton Boyland. However, neither the police nor the prosecution ever identified another shooter.

The prosecutor charged defendant with four counts of assault with intent to commit murder and four counts of felony-firearm. Because defendant admitted to having fired a weapon, the trial centered on whether he fired into the air or toward the two victims and the men who fled. The jury ultimately rejected the defense theory that he only shot into the air and convicted defendant as charged.

---

[1] The police found no evidence of weapon fire directed toward the house.

## II. EVIDENTIARY SUPPORT

On reconsideration, we have considered defendant's challenge to the sufficiency of the evidence, as well as his contention that he is entitled to a new trial because the evidence preponderated against the jury verdict. To preserve a challenge based on the weight on the evidence, a defendant must file a motion for a new trial. *People v Williams*, 294 Mich App 461, 471; 811 NW2d 88 (2011). Defendant filed a motion to remand for a hearing on this issue, but this Court denied the motion without prejudice to the case call panel determining that a remand was necessary. *People v Neal*, unpublished order of the Court of Appeals, entered June 14, 2019 (Docket No. 345748). We continue to believe that a remand is unnecessary as the issue can be adequately considered on the existing record.

"A verdict is against the great weight of the evidence when the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *In re JP*, 330 Mich App 1, 13; 944 NW2d 422 (2019) (quotation marks and citation omitted). We review de novo a defendant's challenge to the sufficiency of the evidence, "view[ing] the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime to have been proved beyond a reasonable doubt." *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Carines*, 460 Mich 750, 758; 597 NW2d 130 (1999) (quotation marks and citation omitted). In making our assessment, we do "not interfere with the factfinder's role of determining the weight of the evidence and the credibility of witnesses." *People v Kosik*, 303 Mich App 146, 150; 841 NW2d 906 (2013). "It is for the trier of fact, rather than this Court, to determine what inferences can be fairly drawn from the evidence and to determine the weight to be afforded to the inferences." *Id.* at 150-151.

To support a conviction for AWIM, the prosecutor must establish the following elements: "(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Davis*, 216 Mich App 47, 53; 549 NW2d 1 (1996) (quotation marks and citation omitted). An "assault" is defined as "either an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v Starks*, 473 Mich 227, 234; 701 NW2d 136 (2005). "The intent to kill may be proven by inference from any facts in evidence." *Davis*, 216 Mich App at 53 (quotation marks and citation omitted). "Because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient to establish a defendant's intent to kill." *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008). In general, the intent to kill may be gleaned from the nature of the acts that constituted the assault, the temperament of the actor at the time of his acts, whether the means used would naturally produce death, use of a dangerous weapon, any declarations by the defendant, and all other circumstances calculated to throw light upon the intention with which an assault was made. See *People v Brown*, 267 Mich App 141, 149 n 5; 703 NW2d 230 (2005); *People v DeLisle*, 202 Mich App 658, 672; 509 NW2d 885 (1993).

The court also instructed the jury that defendant could be held criminally liable for AWIM as an aider and abettor. This instruction rested on the theory that there was a second shooter positioned on the front porch of the Boyland home. To prove aiding and abetting, the prosecution must establish:

> (1) [T]he crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6, 715 NW2d 44 (2006) (quotation marks and citation omitted; second alteration in original).]

The prosecution in this case presented sufficient evidence to support that defendant fired his weapon toward the group of people in front of the house rather than in the air. That act supports the jury's conclusion that defendant had the requisite intent for his AWIM convictions. That intent was not negated by the presence of a second shooter nor would it be negated if no bullet from defendant's weapon actually came into contact with a victim. As defendant's convictions are supportable under a direct liability theory, we need not consider whether defendant's convictions could be supported as an aider and abettor.

Defendant admitted that he fired a gun during this incident. Shamekea testified that she saw defendant shoot into the air and not toward any person. Thomas testified that he saw only a shooter on the porch. Christopher Kabel was standing in a parking lot across from the house and also observed a shooter on the front porch. Grant Eddy, who drove past the home during the melee, similarly testified that he saw a black male run from the home's front porch, "shoulder[] . . . a rifle, and fired the gun and it hit a subject." As other witnesses placed defendant at the home's side door, the shooter observed on the front porch could not have been defendant. This was not dispositive, however, as multiple witnesses testified that they heard shots coming from more than one gun, suggesting that there was more than one shooter.

Davis identified defendant as the person who shot at his friends. Tonya Farmer was mowing the front lawn at a neighbor's home during the shooting. Although Farmer claimed at trial that Davis and his companions pulled guns on the Boyland family first, she identified only defendant as the shooter on the day in question. Farmer did not know defendant's name at the time, but described him as wearing a black and gray striped shirt and blue jeans. Farmer testified at trial that she told the police that defendant fired five or six times, "directly at people," and shot two different people. Turner, testified that he saw the sun reflect off something or some kind of flash at the side of the house and then a bullet hit a tree right behind him. Bruce described that the first shots came from toward the back of the house, although he could not see the shooter.

From this evidence, the jury could determine that defendant fired at least some of his shots toward the group of people in front of his house, rather than into the air. Shooting bullets into a group of people demonstrates an intent to hit and likely kill someone. The jury heard defendant's testimony that he only shot into the air and only intended to frighten the crowd. The jury discredited defendant's version of events and we may not interfere with that assessment. Accordingly, defendant is not entitled to relief.

# III. PROSECUTORIAL MISCONDUCT

Defendant also raises several claims of prosecutorial misconduct. He contends that the prosecutor improperly presented evidence about defendant's prior arrests and mischaracterized certain evidence presented at trial.

To preserve a claim of prosecutorial misconduct for appellate review, a defendant must raise a timely and specific objection below. *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). Defendant preserved his challenge to the prosecutor's mischaracterization of his interview with federal agent David Dwyre. However, he did not object to any of the other alleged incidents of misconduct. Accordingly, the majority of his challenges are unpreserved.

We review de novo preserved issues of prosecutorial misconduct. *People v Aldrich*, 246 Mich App 101, 110; 631 NW2d 67 (2001). The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). The defendant must show that an error occurred and that it resulted in a miscarriage of justice. *Id*. Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting the defendant's substantial rights. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001).

## A

Our initial opinion declared that the prosecutor "first erred by inquiring into the nature of defendant's prior arrests on cross-examination." *Neal I*, p 3. Defendant contended that the prosecutor denied him a fair trial by eliciting testimony regarding his prior arrests during cross-examination.

Defendant took the stand in his own defense. He admitted to shooting a rifle into the air at least three times. He insisted that these were "warning shots" and that he did not deliberately aim at anyone. On the witness stand, defendant vehemently denied having fired the shotgun found at the scene. But when he was interviewed by the police hours after the shootings, defendant claimed that he had, in fact, fired a shotgun. This discrepancy is significant, as the medical evidence proved that Smith was wounded by birdshot pellets fired by a shotgun.

Defendant asserted during his direct examination that when questioned by the detectives he *falsely* maintained that he had fired the shotgun. He conceded that he had lied to the detectives about that fact:

> *A*. I told them . . . what happened, but I end up lying.
>
> *Q*. And what did you lie about?
>
> *A*. I lied about the gun that I shot. I lied about - - well that was about it, the gun that I shot.
>
> *Q*. And when you say you lied about the gun that you shot, what do you mean by that?

-5-

*A.* Well, I told them that I shot the 20-gauge shotgun because of the simple - - I mean, at that time, you know, like I said, I didn't know where my rifle went and I know that this guy just got shot, you know. I don't - - I have a gun - - you know, I didn't know if it was gun residue on me, I'm the only suspect at the time, so I didn't want to be accused that I shot this man. *I've never been in trouble before*, I'm - - I was scared, you know, so I lied about everything besides - - I told the truth about the story and how it happened besides. The only thing I lied about was the 20-gauge shotgun and that's what I shot. I never told them that I shot the .30-30 rifle. [Emphasis added.]

The prosecutor began her cross-examination by attacking defendant's explanation for why he had allegedly lied to the police, honing in on his claim that he had "never been in trouble before." Here is the entirety of the cross-examination on that subject:

*Q.* Sir, you stated you've never been in trouble before true?

*A.* True.

*Q.* You've been arrested on at least three occasions true?

*A.* That was - - that was due to the fact of DV, which is a domestic violence. But so far as anything like this or drugs or anything like that, no.

*Q.* You've been arrested at least twice for assaultive offenses, right?

*A.* Assaulted offenses? Would you - -

*Q.* For assault. You've been arrested for assault on at least two different occasions true?

*A.* No. I'm not sure if that was an assault because I never assaulted anyone.

*Q.* Okay. If your criminal history reflects you've been arrested at least twice for assaulting people would that just be incorrect?

*A.* If you mean by domestic violence, yeah. But so far as assault or me putting my hands on anyone, no.

*Q.* You don't consider domestic violence putting your hands on someone?

*A.* I didn't - - my - - I had a wife at the time, I was married and she - - she was um - - she was bipolar and schizophrenic, she used to call the police a lot on me for no apparent reason. She'd end up getting drunk or anything like that and got mad because I won't give her my car keys or I wouldn't give her any money to get anymore - - anything to drink she would call the police on me. And we had a daughter together so.

*Q.* So it was someone else's fault, right?

-6-

*A*. I wouldn't say it's someone else's fault, I'm just saying, you know, when - - it's just, you know the law so if a female called and say that a man is putting their hands on them, yeah. She never came to court and she never testified or said that I did, so. And I can tell you two occasions she actually came and talked to the judge to try to get me out because of the simple fact she knew that she made false alleg - - you know, I'm sorry, but she made false statements against me.

On appeal, defendant argued that his defense hinged on his credibility and he was denied a fair trial when the prosecutor elicited this testimony regarding his prior arrests for assaultive offenses in an impermissible attempt to impeach his credibility.

In *Neal I*, p 3, we cited the following language from *People v Falkner*, 389 Mich 682, 695; 209 NW2d 193 (1973): "[I]n the examination or cross-examination of any witness, no inquiry may be made regarding prior arrests or charges against such witness which did not result in conviction." *Neal I*, p 3. We failed to acknowledge that this sweeping statement was explicitly limited by our Supreme Court in *People v Layher*, 464 Mich 756, 767; 631 NW2d 281 (2001). The Court instructed in *Lahyer* that "[b]ecause *Falkner*'s holding did not exclude impeachment regarding a witness'[s] bias, we conclude that an express limitation of *Falkner* is warranted and reasonable." *Id*. The *Layher* Court elucidated:

> A proponent's attempt to discredit a witness'[s] testimony by showing that the witness may be biased in favor of, or against, a party or witness, is highly relevant, particularly in cases like the present, where that witness is effectively the sole source of evidence that contradicts the accuser. Denying the factfinder this type of evidence undermines the truth-seeking process. [*Id*. at 768.]

Bias is not the only ground for discrediting a witness. A witness's veracity may also be called into question through simple contradiction. This technique, called impeachment by contradiction, is well established and legally indistinguishable from impeachment for bias in the context of this case.

"Thorough and effective cross-examination of witnesses is at the heart of trial procedure. Witnesses are more likely to impart truthful and accurate information, and erroneous or untruthful testimony is more likely to be revealed, when witnesses are exposed to the crucible of probing inquiry." 2 Longhofer, Michigan Court Rules Practice (4th ed), § 607.1. Impeachment is the goal of cross-examination. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v Alaska*, 415 US 308, 316; 94 S Ct 1105; 39 L Ed 2d 347 (1974). As long as an interrogation is not "repetitive" or "unduly harassing," "the cross-examiner is not only permitted to delve into the witness'[s] story to test the witness'[s] perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." *Id*.

One method of discrediting a witness is by propounding questions demonstrating that the witness lied during direct examination. If a witness testifies falsely on a material subject while being questioned by his own lawyer, the cross-examiner is entitled to pursue the testimony to contradict the false statement. And when a witness puts his credibility directly at issue, as defendant did in this case, he risks being doubly impeached. "Impeachment can be effected in a

number of ways, including contradiction, which involves presenting evidence that the substance of a witness's testimony is not to be believed." *United States v Boswell*, 772 F3d 469, 476 (CA 7, 2014). Impeachment by contradiction is inherently proper under MRE 607, which provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness."

By portraying himself as a naïve innocent in the criminal justice arena, defendant opened the door for the prosecutor to impeach him on that subject. And that is precisely what she did.

"It is essential, . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth." *United States v Havens*, 446 US 620, 626–27; 100 S Ct 1912; 64 L Ed 2d 559 (1980). If a defendant testifies falsely, he opens the door to contradiction—even by illegally seized or otherwise inadmissible evidence.

> [A] defendant's statements made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained and that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt. [*Id*. at 627-628.]

Our Supreme Court, too, has recognized that impeachment by contradiction may be accomplished even by reference to otherwise inadmissible evidence. "Generally speaking, impeachment by contradiction can be a proper purpose for the introduction of other-acts evidence." *People v Wilder*, 502 Mich 57, 63-64; 917 NW2d 276 (2018). "Impeachment of this kind usually occurs when a prosecutor seeks to cross-examine a defendant about prior convictions in order to impeach a defendant's blanket denial on direct examination of ever engaging in conduct similar to the charged conduct." *Id*. at 64. Apart from the overly broad language of *Falkner* disavowed in *Layher*, no Michigan caselaw supports that arrests are "off limits" when impeaching by contradiction. [2]

---

[2] The dissent cuts and pastes a passage from *Michelson v Untied States*, 335 US 469, 482; 69 S Ct 213; 93 L Ed 168 (1948), in support of its argument that the cross-examination regarding defendant's prior arrests was improper. In *Michelson*, the prosecution inquired of the defendant's character witnesses whether they were aware of his prior arrests. The Supreme Court noted that "[a] character witness may be cross-examined as to an arrest whether or not it culminated in a conviction, according to the overwhelming weight of authority[,]" *id*., and applied that rule to affirm the defendant's conviction. The snippet of the opinion cited by the dissent is obiter dictum. And while it states a general rule that can and should apply to cross-examination of a defendant in general, the rule loses its force when a defendant opens the door to impeachment as to a fact that he has injected into the case. See *United States v Weicks*, 362 Fed Appx 844, 849-850 (CA 9, 2010); *United States v Castillo*, 181 F3d 1129, 1132-1133 (CA 9, 1999); *United States v Babbitt*, 683 F2d 21, 25 (CA 1, 1982); *United States v Erb*, 596 F2d 412, 420 (CA 10, 1979); *State v Thomas*, 878 SW2d 76, 77 (MO Ct App, 1994); *Williams v State*, 171 Ga App 927, 928; 321 SE2d

Another way of looking at this issue is through the lens of common sense. If arrests are proper subjects of cross-examination to establish "bias," it is unimaginable that inquiry about arrests would be forbidden to establish that a witness is generally not credible. Revealing a witness's bias is merely one way of attacking the witness's credibility, and bias is but one reason a witness might lie. Defendant placed his credibility squarely at issue when he testified that he lied to the police because he had "never been in trouble before." That was simply untrue, and the prosecutor was fully entitled to challenge it. By forcing defendant to admit that he had been arrested on several prior occasions the prosecutor created a reasonable inference that when arrested after the events at issue, defendant knew he would be questioned by the police and that it would be in his best interests to tell them the truth. A second inference readily established by the impeachment—the more powerful one—was that defendant was willing to lie under oath.

As evidence of defendant's prior arrests was properly admitted to impeach or contradict defendant's testimony on direct examination, the prosecutor engaged in no misconduct. And defendant's alternative claim that his trial counsel was ineffective for failing to object must also fail. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000).

B

We also declared in *Neal I*, p 3, that the prosecutor "erred by repeatedly mischaracterizing defendant's second interview with police." This declaration, too, was in error.

Defendant contends that the prosecutor repeatedly insinuated on cross-examination that defendant only changed his story to the police when confronted with the results of the DNA testing. In fact, the DNA test results were never mentioned in any police interview.

On cross-examination, the prosecutor asked defendant why he had changed his story to claim that he had only fired a rifle and not the shotgun. The prosecutor's questions suggested that the shift was attributable to DNA findings revealed during an interview with Agent Dwyre:

> *Q*. And Special Agent Dwyre then confronted you with the fact that your DNA had been found on the rifle, right?
>
> *A*. Yes. I been knew [sic] that my DNA was on the rifle.
>
> *Q*. You never changed your story and admitted to shooting the rifle until you were confronted with the fact that your DNA was on the rifle, right?
>
> *A*. No, ma'am. I never talked to - - when I got my paperwork to saying [sic] that the DNA was on there, I never talked to a detective or a police officer ever since then until the time that I talked to [Dwyre], and that was the only chance that I had to tell him that, okay, yes. I want to go on ahead and give it to you flat out

---

423 (Ga Court of Appeals, 1984). Furthermore, the dissent's citation to MRE 404(b)(1) is misplaced, as no *evidence* regarding the arrests was introduced.

because, you know, I know I'm already in a situation, but when I have told before was a lie and I want the truth to be heard.

When cross-examination ended, defense counsel lodged an objection, asserting that Dwyre had not raised the subject of DNA when he interviewed defendant. Further, counsel pointed out, the interview took place seven months after the DNA findings had been revealed. The prosecutor immediately admitted that she did not see a reference to DNA in the transcript of the interview, continuing:

> *Q.* Oh, no. I'm sorry I'm not seeing it either. I could've sworn it I saw it in the report and I apparently did not. I - - Your Honor, I swear - - I could've sworn I saw it in the report. He was confronted with something else, and I apologize, that was my mistake. You can clear it up on cross-examination and I fully apologize. I'm very sorry. I thought it was in the report, he was confronted about something else. He was confronted about the victim being shot with a shotgun and him having a shotgun. That I did not know.

> *The Court*. Okay.

Defense counsel expressed doubt that it was an "honest mistake" and complained, "I don't have Detective Dwyre here to put him on the stand to sit there and say you were never asked about that." The trial court suggested a "limiting instruction," and defense counsel asked for a "curative instruction." The prosecutor readily agreed to this plan and admitted her error, forthrightly then and there:

> *The Prosecutor*. That's perfectly fine. Yes, he was not - -

> *The Court*. - - will not oppose a curative instruction.

> *The Prosecutor*. - - he was not questioned about DNA. And I have not had the opportunity to review the video. I'm only reviewing the report right now and based on Attorney White being an officer of the court that he reviewed the video over the course of the lunch hour and could not find it, then I will go with that, Your Honor, and I have no issues with that.

> The other thing we could do is we do have agent Dwyer on the witness list. I don't know if the Court or attorney White would prefer that he be brought in. The only issue is going to be that I believe he's in Lansing, so it would take a while to get him here. I don't know how defense wants to handle it, but we could either try to get him here or we could go with a curative instruction. That's completely up to the Court and to defense. I do apologize.

The trial court then asked defense counsel, "Mr. White, which do you prefer?" Counsel consulted the witness lists to determine whether Dwyre was a listed witness; the court indicated that it would be open to whatever relief counsel preferred:

> *The Court*: Again, Mr. White, this is in your court. The prosecution clearly is amenable to a number of ways to cure this. And so - -

-10-

> *Mr. White*: Given the issue - -.
>
> *The Court*: - - and the Court is, you know, the Court can give a curative instruction regardless of whether Dwyre comes in or not.
>
> *Mr. White*: I mean, I guess I would ask for a curative instruction[.]

Defense counsel agreed that the prosecutor would be given an opportunity to review the tape of the interview, and suggested that the instruction could be given after she did so. The court then interjected:

> *The Court*. No, the curative instruction would not take place today, it would be part of the final instructions is what I'm suggesting and that we would be able to deal with that following the closings. I don't think we need to do it now.
>
> *The Prosecutor*: *Whatever the Court and defense wants*.
>
> *The Court*: Mainly because I want to give both of you the opportunity to review the tape completely.
>
> *The Prosecutor*: Of course.
>
> *The Court*: Okay?
>
> *Defense Counsel*: Yes, Your Honor. [Emphasis added].

While trying a lawsuit, mistakes happen. Lawyers sometimes misremember things. Prosecutors have an obligation to take great care in this regard. But this mistake was hardly important, the prosecutor immediately confessed it, and she readily agreed to whatever cure the defense wanted, including bringing Dwyre to the courthouse. Counsel asked for a curative instruction, agreed that it would not be given that day, and a curative instruction was read to the jury the next day.[3] This is not prosecutorial misconduct, particularly given defense counsel's

---

[3] A curative instruction is usually sufficient to cure any prejudicial effect flowing from an inappropriate prosecutorial comment. *People v Ericksen*, 288 Mich App 192, 199-200; 793 NW2d 120 (2010). The instruction given in this case provided:

> During [defendant's] testimony, he was questioned about changing his statement after being confronted by Special Agent Dwyre regarding [defendant's] DNA being found on a gun. You have heard evidence the defendant learned of the DNA results after his first statement to Detective Trooper Kalakay but before he made his statement to Special Agent David Dwyre. No evidence was presented, nor does any exist that Special Agent Dwyre discussed [defendant's] DNA while questioning him. Therefore, you should disregard the line of questioning pertaining to Special Agent Dwyre's confronting [defendant] about DNA when considering [defendant's] testimony during deliberations.

approval of the court's proposal. And regardless of when or how defendant learned of the DNA evidence, he repeatedly admitted that he changed his story. Even if it amounted to misconduct, we cannot find this corrected error outcome determinative.

C

Finally, in *Neal I*, p 4, we held that "the prosecutor continuously asserted that there was no testimony that any of the men running away were armed or that anyone fired back at defendant." This was a mischaracterization of the evidence, we held because "one witness testified that he saw a person who appeared to be shooting from the street run away, and another testified that a group of men pulled up to the house and pointed guns at defendant's family." *Id*. However, further examination of the evidence does not bear out the existence of any plainly erroneous mischaracterizations. And even if there were, they did not affect defendant's substantial rights.

Here are the witnesses who testified that they did not see anyone with a gun other than defendant: defendant himself, Davis, Shamekea, Thomas, Smith, Turner, Rochelle, and Eddy. Donald Houghtaling lived in the neighborhood and heard the gunshots. He testified on direct examination, "I never saw who was shooting." On cross-examination, he listened to his call to 911 and the following exchange occurred:

> *Q*. [J]ust so we're clear, you just told 911 that you saw someone shooting at a car as they're running away, is that correct?
>
> *A*. Well, there was a car that stopped at the corner of West Court and Durand - -
>
> *Q*. All right.
>
> *A*. - - and they got out and appeared to be shooting - - we got - - we got in behind the house when we heard that and then that vehicle went down West Court and pulled over behind the church down there.

On recross-examination, however, Houghtaling testified" "We never saw a person shooting." The prosecutor followed up with "You never saw a person shooting at all?" Houghtaling answered: "No."

Plainly, the prosecutor did not misrepresent or mischaracterize Houghtaling's testimony. On closer questioning, Houghtaling backed off his "appeared to be shooting" comment. An effective cross-examination clears up ambiguities. That is precisely what happened here.

Tonya Farmer told a number of different stories. Her testimony was so disjointed and unsettling that counsel agreed that the trial court would conduct a competency evaluation before her testimony concluded. At one point, Farmer testified that the only person she saw with a gun was defendant. At another point, she testified that she saw five armed men get out of a car. She later admitted that the testimony regarding the five men was untrue. Once again, the prosecutor did not mischaracterize or misrepresent her testimony. Farmer was all over the place and the jurors could judge for themselves what she said and what could be believed. And more importantly, any discrepancy between the evidence and the prosecutor's statement was unlikely to have affected the

jury's decision to discredit defendant's testimony. Even if it contained a misstatement, the prosecutor's argument did not deny defendant fair trial.

Accordingly, on reconsideration, we no longer believe that vacation of defendant's convictions and sentences is warranted based on the prosecutor's conduct.

As we no longer hold that defendant is entitled to a new trial on prosecutorial misconduct grounds, his remaining appellate challenges are no longer moot. We now address defendant's remaining two arguments in turn.

## IV. VICTIM'S PRIOR CRIMINAL HISTORY

Defendant contends that the trial court abused its discretion and denied him the right to present a defense by excluding evidence regarding Davis's violent criminal history. Relevant to this appeal, Michigan State Police Trooper Matthew Kalakay responded to the scene of the shooting to assist the city police force. During the investigation, Trooper Kalakay interviewed Davis. On cross-examination, Trooper Kalakay indicated that he ran Davis's name through LEIN "because we didn't know if he was a suspect or not at the time" and "discovered that Mr. Davis had a prior criminal record." Defense counsel attempted to ask the trooper the nature of Davis's prior offenses and whether he "had ever had a criminal conviction or anything involving a gun or a crime of violence," but the court sustained the prosecutor's objections on relevance grounds.

We review for an abuse of discretion the trial court's evidentiary ruling, *People v Duncan*, 494 Mich 712, 722; 835 NW2d 399 (2013), and review de novo any underlying legal questions affecting admissibility. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). Defendant did not raise his constitutional challenge based on his ability to present a defense until he filed his appellate brief. That issue is therefore unpreserved, and our review in that regard is limited to plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763.

We note that defense counsel did not attempt to question Davis on cross-examination about his criminal history in an attempt to counter Davis's description of events and his intentions in visiting the Boyland home with a car full of male companions. And when the court excluded testimony about the nature of Davis's criminal history during cross-examination of Trooper Kalakay, defense counsel made no attempt to explain the relevance of the testimony or argue any ground supporting admission.

In any event, even absent the subject evidence, defendant was able to present the defense that he only armed himself and fired a weapon because he feared for the safety of himself and his family. The evidence clearly showed that Davis and Shamekea had argued earlier in the day and that defendant had intervened to protect his sister. Davis admitted that it was a poor decision to return to the Boyland home with a car full of people because it could signal that he returned with an intent to retaliate. He also testified that for this reason, he asked the other men to remain in the car while he went to the house to get his cell phone. Davis claimed the other men did not comply with his request. Davis thereby described that he created a tense situation in which the people at the Boyland home would justifiably feel threatened. On this record, we discern no ground to order relief.

## V. WITNESS COMPETENCY

Finally, defendant contends that the trial court abused its discretion in permitting Tonya Farmer to testify at trial. As noted, Farmer's testimony was scattered and chaotic. She provided conflicting versions of events and described meeting defendant prior to the current events at a time when defendant was actually incarcerated and not living with his sisters. On cross-examination by defense counsel, Farmer claimed she suffers from bipolar disorder, schizophrenia, and ADHD. Upon learning this information, defense counsel requested a hearing to determine if Farmer was competent to testify.

A separate hearing was conducted, at which the prosecutor indicated that Farmer had not previously mentioned her mental health diagnoses. At the hearing, Farmer indicated that she understood the difference between the truth and a lie and would not provide false testimony "because lying gets you in trouble." The court found Farmer credible to testify, but ruled that defense counsel could pose additional questions before the jury to test Farmer's credibility.

The following day, Farmer continued to testify before the jury. She continued to provide conflicting testimony. For example, Farmer testified that she lied on the stand when she claimed she observed five armed men exit a vehicle in front of the Boyland home. She then recanted and again asserted that Davis and his companions pointed guns at the Boyland family. Ultimately, the court instructed the jury to assess Farmer's credibility just as it would consider the credibility or lack thereof of any other witness.

MRE 601 provides that "every person is competent to be a witness" "unless the court finds after questioning a person that the person does not have sufficient physical or mental capacity or sense of obligation to testify truthfully and understandably." "The test of competency is thus whether the witness has the capacity and sense of obligation to testify truthfully and understandably." *People v Watson*, 245 Mich App 572, 583; 629 NW2d 411 (2001). A person suffering from diminished mental capacity may be competent to testify, even if the witness becomes "confused," as long as the witness is able to understand the obligation to testify truthfully. See *People v Breck*, 230 Mich App 450, 458; 584 NW2d 602 (1998); *People v Flowers*, 222 Mich App 732, 737; 565 NW2d 12 (1997).

Of import, testing the competency of a witness is a threshold issue. "[A] later showing of the [witness's] inability to testify truthfully reflects on credibility, not competency." *Watson*, 245 Mich App at 583 (quotation marks and citation omitted). Although defense counsel could not make a pretrial motion to test this witness's competency given the lack of information, defendant was not prejudiced in any regard. The court took time to consider the issue when it arose. And the court specifically instructed the jury to consider and assess Farmer's credibility before relying on her testimony. Accordingly, defendant has again not satisfied this Court that relief is warranted.

We affirm.


/s/ Elizabeth L. Gleicher

-14-